**UNITED STATES of America,
Appellee,**

v.

**Vincent Peter PISACANO et al.,
Defendants-Appellants.**

**No. 631, Docket 72-1181.**

United States Court of Appeals,
Second Circuit.

Argued March 10, 1972.

Decided April 7, 1972.

---

7. Heydon's Case, 3 Co.Rep. 7a, 76 Eng.Rep. 637 (1584).

Patrick T. Philbin, Sp. Atty., U. S. Dept. of Justice (Whitney North Seymour, Jr., U. S. Atty. S. D. N. Y. and Patrick F. Broderick, Sp. Atty., U. S. Dept. of Justice, of counsel), for appellee.

Henry K. Chapman, New York City, for appellants Pisacano.

Irving Rader, New York City, for appellant Commerato.

Before FRIENDLY, Chief Judge, TIMBERS, Circuit Judge, and JAMESON, District Judge.*

FRIENDLY, Chief Judge:

Defendants were the subject of a four count indictment returned originally on May 26, 1971 by a grand jury in the Southern District of New York and superseded by a second indictment on December 15, 1971, in order to correct a clerical error. Count 1 charged a conspiracy to violate 18 U.S.C. § 1952 (in-

* Of the United States District Court for the District of Montana, sitting by designation.

terstate and foreign travel or transportation in aid of racketeering enterprises) and 18 U.S.C. § 1084 (transmission of wagering information by wire communication in interstate commerce). Count 2 charged a substantive offense under § 1084, and Counts 3 and 4 substantive offenses under § 1952. Defendants pleaded not guilty to the initial indictment in June, 1971, and also to the superseding indictment in December, 1971, and awaited January 5, 1972, the date for which trial had been set. At that time their counsel announced their intention to plead guilty to Count 1, with the understanding that the other counts would be dismissed on the date of sentence, February 15, 1972. Judge Frankel displayed meticulous care in taking the pleas, a process which consumed some three hours; defendants unequivocally admitted their guilt.

By letter dated February 4, 1972, counsel for two of the defendants applied for a postponement of the sentence in order to explore the implications of the January 12 decision of the Fifth Circuit in United States v. Robinson, No. 71–1058, discussed below. The judge denied this in a brief opinion. At the time of sentencing, counsel renewed the postponement motion and further moved for permission to withdraw the pleas of guilty, F.R.Cr.P. 32(d). The court also denied these motions and proceeded to impose relatively light sentences, as set forth in the margin.[1] Appellants contend the denial of the motion to withdraw the guilty pleas was an abuse of discretion.

In order to understand this contention it is necessary to revert to United States v. Robinson, *supra*. As stated in Judge Clark's opinion, that appeal, from a conviction after a trial, had been intended to raise the constitutionality of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 et seq., which permits wiretaps and other electronic surveillance as aids to crime detection. However, as a result of "the development of facts unknown until the case was before" the court of appeals, the appeal was regarded as presenting "only the question of who may initiate an application to engage in such secret electronic surveillance under the authorization proviso of that legislation." This provision, 18 U.S.C. § 2516(1), reads in pertinent part as follows:

> The Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize an application to a Federal judge of competent jurisdiction for, and such judge may grant in conformity with section 2518 of this chapter an order authorizing or approving the interception of wire or oral communications by the Federal Bureau of Investigation, or a Federal agency having responsibility for the investigation of the offense as to which the application is made. . . .

Affidavits before the court indicated that Sol Lindenbaum, Executive Assistant to the Attorney General of the United States, had approved actions designating Will Wilson, then Assistant Attorney General in charge of the Criminal Division, to authorize a designated field official to apply to a federal judge for interception orders under 18 U.S.C. § 2518, and that Henry E. Petersen, then a Deputy Assistant Attorney General in the Criminal Division, had signed Will Wilson's name "in conformity with the standard procedure of dispatching such a letter in every case in which Will Wilson had been specially designated on an

---

1. Pursuant to 18 U.S.C. § 3651 the trial court imposed split sentences on Vincent and Alphonso Pisacano whereby each received a three year sentence but the former was to serve only four months of his sentence in a jail-type institution and the latter was to serve only three months of his sentence in such an institution. The court directed that the remainder of each of their sentences be suspended and that each be placed on probation for a period of two years following their release from confinement. The court suspended imposition of a sentence of imprisonment on appellant Commerato; it fined him $250 and placed him on probation for two years.

*ad hoc* basis to authorize" the application. Pointing to a statement in S.Rep. No. 1097, 90th Cong., 2d Sess., reprinted in 1968 U.S.Code Cong. & Admin.News, pp. 2112, 2185, concerning § 2516(1) which we quote in the margin,[2] the court ruled that, despite the general power of the Attorney General to delegate authority, 28 U.S.C. § 510, the purpose of the statute in regard to wiretaps had been subverted by what it considered a routine method of handling authorizations to apply for them in the Criminal Division of the Department of Justice, and reversed convictions that had been obtained on the basis of evidence procured through wiretaps permitted on such applications.

Appellants contended that since the authorization for wiretaps here were obtained at about the same time as those in *Robinson*, and since the evidence thereby secured had been the chief basis for their indictment and would have constituted the principal proof at trial, as the Government now concedes,[3] they should have been allowed to withdraw their guilty pleas under F.R.Cr.P. 32(d). The Government responds that reversal after trial is one thing and refusal to permit withdrawal of a guilty plea another; it relies on the familiar rule that the standard governing appeals from such a refusal is abuse of discretion. United States v. Hughes, 325 F.2d 789, 791–792 (2 Cir.), cert. denied, 377 U.S. 907, 84 S.Ct. 1167, 12 L.Ed.2d 178 (1964); United States v. Giuliano, 348 F.2d 217, 221–222 (2 Cir.), cert. denied, Prezioso v. United States, 382 U.S. 939, 946, 86 S.Ct. 390, 15 L.Ed.2d 349 (1965). Certainly there were here no equities in the usual sense in favor of these defendants, who, despite the substantial interval between their initial pleas of not guilty and the date set for their trial, pleaded guilty only after the court had reserved time for trial and the Government had brought witnesses from considerable distances. On the other hand, it would be an abuse of discretion for a judge to refuse to allow withdrawal of a plea if, on the facts before him, a conviction thereon could not survive collateral attack. The question thus becomes whether defendants' guilty pleas were "unfairly obtained or given through ignorance, fear or inadvertence," Kercheval v. United States, 274 U.S. 220, 224, 47 S.Ct. 582, 583, 71 L.Ed. 1009 (1927), or constituted "knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences," Brady v. United States, 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747 (1970) (footnote omitted). The fact that a judge has done everything possible to insure the latter, as Judge Frankel did here, thus would not be dispositive if, on a motion for withdrawal of a guilty plea, it appeared, for example, that the prosecutor had withheld from the defendants and the judge his knowledge that the Government's case rested in large part on what he knew would be perjured testimony, even though the defendant was in fact guilty and had so admitted. Contrast McMann v. Richardson, 397 U.S. 759, 768–771, 90 S.Ct. 1441, 25 L.Ed. 2d 763 (1970).

Since the record did not adequately show how the authorizations for interception had here been obtained or what knowledge of any defects the prosecutor had, we requested the Government, after

---

2. This provision centralizes in a publicly responsible official subject to the political process the formulation of law enforcement policy on the use of electronic surveillance. Centralization will avoid the possibility that divergent practices might develop. Should abuses occur, the lines of responsibility lead to an identifiable person. This provision in itself should go a long way toward guaranteeing that no abuses will happen.

3. Appellants do not suggest that the indictments are invalid. Cf. Lawn v. United States, 355 U.S. 339, 348–350, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958) ; United States v. Blue, 384 U.S. 251, 255 n. 3, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966). See the discussion and decisions cited in Hall, Kamisar, LaFave and Israel, Modern Criminal Procedure 802–06 (3d ed. 1969).

argument, to produce additional information. It filed this, along with a supplemental memorandum, to which the appellants have replied.

The affidavits furnished us with respect to the administration of § 2516(1) present a rather different picture from those before the Fifth Circuit in *Robinson*,[4] in which the Government advises it has sought reconsideration. According to Mr. Lindenbaum, Executive Assistant to the Attorney General of the United States since April 11, 1967, Attorney General Mitchell "refrained from designating any Assistant Attorney General to authorize, without his approval, the making of an application for an order permitting the interception of wire or oral communications" under 18 U.S.C. § 2516(1); what were called "designations" of Mr. Wilson in the affidavit Mr. Lindenbaum submitted to the Fifth Circuit were merely permissions to perform the ministerial act of authorizing the law enforcement officers in the field to make applications which the Attorney General's own office had already approved. The requests made here were first reviewed by a special unit of the Organized Crime and Racketeering Section of the Criminal Division. On their recommendation of approval the file was submitted to a Deputy Chief of that Section; his favorable recommendation was reviewed by a Deputy Assistant Attorney General in the Criminal Division, who sent a detailed recommendation to the Attorney General that authorization be granted. This recommendation went, in regular course, to Mr. Lindenbaum who, since February 1969, has reviewed such requests, has made recommendations to the Attorney General, and, on occasion and with the Attorney General's authority, has acted on the latter's behalf. Three recommended authorizations, dated respectively July 30, August 12 and August 27, 1970, are here at issue. The August 12 and 27 requests were approved by the Attorney General himself, in the first case by his initial-

ling a memorandum, and in the second by specific telephone authorization to Mr. Lindenbaum to do so. Clearly these complied with § 2516(1), no matter how strictly read. This leaves only the July 30 request to which Mr. Lindenbaum affixed the Attorney General's initials on the basis of his conclusion, stemming from his knowledge "of the Attorney General's actions on previous cases, that he would approve the request if submitted to him."

■ This recital suffices to show that the procedures here followed, even as to the July 30 request, were, to say the least, a much closer approach to the desires of the Senate Committee, see fn. 2, than what the Fifth Circuit concluded from the affidavits submitted to it. The Attorney General assumed full responsibility for what was done even if he did not act himself in every case. From what now appears, the "narrow limitation" on authorizations by "top department officials" prescribed in § 2516(1) did result in the establishment of "a unitary policy in the use of the awesome power conferred" in Title III —as the *Robinson* court concluded was the intent of Congress. Indeed, that court remarked that a direct authorization by the Executive Assistant "would have assured that the application was deemed warranted in this particular case and was not 'routinely' made by the Assistant Attorney General's deputy, 'in conformity with the standard procedure.'" Moreover, the procedures used clearly conformed with the letter of § 2516(1), particularly when this is read in light of the evidence, furnished by § 101(a) of the Civil Rights Act of 1968, 18 U.S.C. § 245(a) (1), that when Congress wished to prohibit delegation of any sort, it knew how to do it. This could well be "a case for applying the canon of construction of the wag who said, when the legislative history is doubtful, go to the statute." Greenwood v. United States,

L.Ed. 412 (1956) (Frankfurter, J.). We are thus not at all convinced that if this case had gone to trial and the court had refused to suppress evidence obtained by the wiretaps, we would have reversed.[5]

The material furnished by the Government at our request also revealed the following: The issue of the validity of the wiretap in *Robinson* was first raised by a motion to remand on October 26, 1971.[6] The Department promptly advised all Organized Strike Force chiefs of the existence of the issue, by memorandum dated November 10; it did not advise United States Attorneys. Patrick T. Philbin, the Special Attorney of the Joint Strike Force who represented the Government when defendants' pleas were taken on January 5, 1972, was unaware of the issue.

The case is thus rather far removed from our hypothetical of a prosecutor's remaining silent when he knew that the case against defendants who were pleading guilty would rest, in the main, on perjured evidence. Any defect in the evidence here would have been not in its reliability but in the way the Government had secured it. Even as to that, the objection was not of constitutional dimensions; it could not be seriously contended that the Fourth Amendment required Congress to forbid any delegation by the Attorney General. When the pleas were taken, no court had yet determined that any defect existed in the authorization procedures, and, now that the procedures have been explained better than the Government did in *Robinson*, we are not at all sure that there was. The prosecutor who was present when the plea was taken suppressed nothing that was within his personal knowledge. We are well aware of the Chief Justice's recent statement in Santobello v. New York, 404 U.S. 257, 262, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971):

> The staff lawyers in a prosecutor's office have the burden of "letting the left hand know what the right hand is doing" or has done.

But that decision dealt with the breach of an agreement in a specific case by a predecessor of the prosecutor to refrain from making a sentence recommendation —quite a different thing from the failure of the chief of the New York Organized Strike Force to advise his subordinate of an unresolved issue concerning the validity of wiretap authorizations. In Kyle v. United States, 297 F.2d 507, 513–515 (2 Cir. 1961), and United States v. Keogh, 391 F.2d 138, 146–148 (2 Cir. 1968), we have explored what seem to us to be the relevant considerations and need not repeat that discussion here. Since the prosecutor was not guilty of any personal misconduct, we are not required to decide what result we would reach if his chief had informed him of the existence of the issue and he had remained silent.

Affirmed.

---

5. Having concluded that the Justice Department's procedures were very likely consistent with the mandate of § 2516(1), we would not be inclined to rule that the authorizations were nevertheless invalid in light of 28 U.S.C. § 2518(1) (a) & (4) (d) which require that the application and the court order indicate the officer authorizing the application. While Will Wilson was identified as the authorizing officer when in fact the Attorney General or Mr. Lindenbaum had approved the applications, this discrepancy did not meaningfully subvert the congressional scheme. The legislative history indicates that the purpose of both subparagraph (1) (a) and subparagraph (4) (d) of § 2518 was simply to ensure "that responsibility will be fixed." S.Rep.No.1097, *supra*, 1968 U.S.Code Cong. & Adm.News at pp. 2192 & 2189. Perhaps the procedures adopted by the Justice Department were not the best for ascertaining the official who exercised the "responsibility" for authorizing applications as prescribed in § 2516 (1); but, as is evident from this case, that procedure does nonetheless ensure that the responsible official be reasonably identifiable.

6. The point had previously been raised on September 13, 1971, in a case in the Northern District of Georgia.