UNITED STATES of America,
Appellee,

v.

Eddie David COX, Appellant.

UNITED STATES of America,
Appellee,

v.

Carl Edward BRANCH, Appellant.

UNITED STATES of America,
Appellee,

v.

Edward Courtland MILLER, Appellant.

UNITED STATES of America,
Appellee,

v.

James Phillip DEARBORN, Appellant.

Nos. 71–1108, 71–1135, 71–1139, 71–1167.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 17, 1972.

Decided June 5, 1972.

Rehearing and Rehearing En Banc
Denied July 19, 1972.

Robert G. Duncan, Kansas City, Mo., for appellants, Cox, Branch and Miller.

James R. Wyrsch, Kansas City, Mo., for appellant, Dearborn.

Anthony P. Nugent, Asst. U. S. Atty., Kansas City, Mo., for appellee.

Before MATTHES, Chief Judge, and LAY and ROSS, Circuit Judges.

MATTHES, Chief Judge.

Appellants Cox, Branch and Miller are three of the 17 persons named in a thirty-count indictment which resulted from uncovering in Kansas City, Missouri, a large narcotics ring.[1] The three above-named appellants were jointly tried, and in separate verdicts, were found guilty as charged in Count I of the indictment. This count alleged a conspiracy by all 17 defendants, and other persons not named as defendants, to violate 21 U.S.C. §§ 173 and 174, which proscribe trafficking in a narcotic drug knowing it to have been illegally imported.[2]

The charges against appellant Dearborn were severed for trial. He pleaded *nolo contendere* to Count I and was convicted in a separate trial of two substantive counts: possessing heroin in violation of 18 U.S.C. § 2 and 26 U.S.C. § 4704(a) [Count XX]; and receiving, concealing, and facilitating the transportation and concealment of heroin knowing that the drug had been illegally imported, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 173 and 174 [Count XXI].

Appellant Cox was sentenced to imprisonment for 15 years, Branch for 12 years and Miller for 17 years. Appellant Dearborn was sentenced to concurrent terms of 20 years on Counts I and XXI and a consecutive 5 year term on Count XX.

Cox, Branch and Miller each had individual representation by counsel in their joint trial. Dearborn also had individual representation at his separate trial. Each of the four appellants filed a separate notice of appeal. The appeals were consolidated in this court for the purposes of argument and opinion. Appellants Cox, Branch and Miller are represented by the same attorneys in this court and a joint brief has been filed on their behalf. Appellant Dearborn is represented by another attorney who has filed two briefs in Dearborn's behalf.

Cox, Branch and Miller in their brief rely upon five points for reversal: (1) insufficiency of the evidence to show they possessed heroin, or alternatively, insufficient evidence to prove that the heroin possessed was illegally imported or that they had knowledge of its illegal importation; (2) the alleged unconstitutionality of the presumption of knowledge of illegal importation of heroin arising from possession of it; (3) error in the admission of evidence of certain sales of narcotics by other persons; (4) error in the instructions relating to the conspiracy to violate 21 U.S.C. § 174; and (5) error in refusing to sever some of the conspiracy charges, the contention being that two or more separate conspiracies existed.

Appellant Dearborn in his initial brief also challenged the constitutionality of the presumption in 21 U.S.C. § 174 and the sufficiency of the evidence of his possession, and knowledge of the illegal imporation, of heroin. Additionally, his brief contested: (1) the sufficiency of the evidence, as to the charge under 26 U.S.C. § 4704(a), to prove the heroin he possessed was not in a stamped package; (2) the admission into evidence of narcotics paraphernalia seized from his possession; (3) the failure of Judge Hunter, the trial judge, to recuse himself when Dearborn allegedly proved the

---

1. Of the 17 persons indicted, the alleged ringleader, Eugene Richardson, and 8 other persons pleaded guilty. One was never arrested, one died, and two were acquitted (one by the court and one by the jury) in the same proceedings in which Cox, Branch and Miller were convicted. The final defendant was convicted in a separate trial. *See* United States v. Moody, 462 F.2d 1307 (8th Cir. 1972), opinion filed contemporaneously with this opinion.

2. The conspiracy count alleged 54 overt acts. Cox was named in 5, Branch in 12, Miller in 5 and Dearborn in 8. A majority of the alleged overt acts were based upon telephone conversations on April 30, May 1, May 2, May 3, May 4, May 5, May 6, May 7, May 8, and May 9, 1970. By the court's instructions, the crime charged in Count I was limited to trafficking in heroin. Consideration of activities concerning cocaine was by specific instruction removed from the jury's consideration.

judge had prejudged Dearborn's case; (4) the validity of the search of Dearborn's home based upon the "poisonous tree" doctrine and the allegedly illegal execution of the warrant; and (5) the constitutionality of the wiretapping provisions of the Omnibus Crime Control Act of 1968, 18 U.S.C. § 2510 et seq., upon which all the evidence against Dearborn ultimately rests.[3]

Dearborn also filed a supplemental brief asserting all the wiretap evidence should have been suppressed: (1) because the government failed to "minimize" the interceptions of telephone conversations; and (2) because the requirements of the statute relating to authorization of an application for the wire interception order were not followed.

Shortly prior to the arguments in these appeals, appellants Cox, Branch and Miller moved this court in the alternative either to remand their cases to the District Court for hearing to determine whether the statutory procedures for authorization of the wiretap were followed, or to decide that issue upon the affidavits presented in this court. At oral argument the attorney for appellants Cox, Branch and Miller was granted leave, without objection by the government, to join with Dearborn's counsel in presenting the validity of the authorization procedures. Similarly, because the wiretap was the source of most if not all, of the evidence against Cox, Branch and Miller, and since the constitutionality of that same wiretap was raised in this appeal by Dearborn, the Court, in an attempt to avoid collateral proceedings, has on its own initiative elected to consider the issue of the constitutionality of 18 U.S.C. § 2510 et seq., as applying to their cases as well as to Dearborn's. Therefore, the questions of authorization for, minimization of, and constitutionality of, the wiretap apply equally to all four appellants; and, inasmuch as the wiretap was the source of these convictions, we turn at the outset to those three contentions. In doing so we need not detail the substance of the conversations heard. It is sufficient to note there were introduced into evidence a number of recorded conversations which were selected from the ninety reels of taped conversations overheard via a wiretap on the telephone of Eugene Richardson, the alleged ringleader of the conspiracy.

### I. The Wiretap Authorization

We turn initially to appellants' contention that the government, in seeking judicial authorization for the wiretap, failed to conform to the procedural requirements of the Crime Control Act. Specifically, the contention is that, as in United States v. Robinson, No. 71–1058 (5th Cir., Jan. 12, 1972); United States v. Aquino, 338 F.Supp. 1080 (E.D.Mich. 1972);[4] and United States v. Cihal, 336 F.Supp. 261 (W.D.Pa.1972), the authorization to apply for the wiretap warrant was issued not by the Attorney General or an Assistant Attorney General, as required by 18 U.S.C. § 2516(1), but by their assistants. That statute provides in pertinent part:

"The Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize an application to a Federal judge of competent jurisdiction for, and such judge may grant in conformity with section 2518 of this chapter an order authorizing or approving the interception of wire or oral communi-

---

3. The government in its brief contends that, because Dearborn pleaded *nolo contendere* to Count I, he cannot raise on appeal from that conviction either the constitutionality of the wiretap or the constitutionality and evidentiary burden of the presumption in 21 U.S.C. § 174. *See*, United States v. Clark, 459 F.2d 977 (8th Cir., 1972). However, since both those issues must nevertheless be decided in this case either as to Dearborn's other convictions or those of Cox, Branch and Miller, we find it unnecessary to rest affirmance upon this ground.

4. In *Aquino* the original authorization was valid, but the Court struck down the extension of the wiretap, finding the renewal authorization invalid.

cations by the Federal Bureau of Investigation, or a Federal agency having responsibility for the investigation of the offense as to which application is made. . . ."

In *Robinson, Cihal* and *Aquino,* each court was presented affidavits from the participants showing the Justice Department's procedure in those cases involved neither former Attorney General John Mitchell nor former Assistant Attorney General Will Wilson. Instead, General Mitchell's Executive Assistant, Sol Lindenbaum, designated Wilson to authorize the application and Deputy Assistant Attorney General [now Assistant Attorney General] Henry Peterson sent the letter of authorization signing Wilson's name thereto. Finding legislative history evidencing a congressional intention to affix upon the publicly visible officers named in the statute the responsibility to consider whether a wiretap was warranted in each particular case, and finding that

neither of the statutorily named officers ever scrutinized the application as required, those courts held that procedure vitiated the wiretap order and the evidence procured by it.

The present case, however, is factually distinguishable from those cases. Here, Peterson's affidavit [5] demonstrates that the application from the Bureau of Narcotics was first considered by an attorney in the Organized Crime and Racketeering Section of the Criminal Division of the Justice Department for "strict adherence to the required statutory, judicial and Constitutional standards." That attorney then forwarded his favorable recommendation to the Deputy Chief of the Section, who commended the application to Peterson. Peterson "examined the file and forwarded it to the Office of the Attorney General with a detailed recommendation that the authorization be granted." As Lindenbaum's affidavit [6] and General Mitchell's personally

5. The affidavit of Mr. Peterson recites in pertinent part:

AFFIDAVIT

Henry E. Petersen, being duly sworn, deposes and says:

I am Assistant Attorney General in charge of the Criminal Division. At the times of the events related in this affidavit, I was a Deputy Assistant Attorney General in the Criminal Division, United States Department of Justice.

. . . . .

Our file indicates that the formal request for authorization to apply for a wire interception order in this matter was made by the Bureau of Narcotics and Dangerous Drugs. Prior to action on the request, the Department file, which included copies of the proposed affidavit, application, and order, was reviewed [as described in the text]. . . . The file was then sent to me. I examined the file and forwarded it to the Office of the Attorney General with a detailed recommendation that the authorization be granted. Following approval in the Office of the Attorney General, the Criminal Division dispatched the letter dated April 29, 1970, to Calvin K. Hamilton advising him that he was authorized to present the application to the court.

I signed Will Wilson's name to the letter of April 29, 1970, in accordance with the authorization of Will Wilson and the standard procedures of the Criminal Division. I regarded the signing of Will Wilson's name as a ministerial act, because Will Wilson had authorized me to sign his name to and dispatch such a letter of authorization in every instance in which the request had been favorably acted upon in the Office of the Attorney General. Will Wilson did not examine either file or expressly authorize either application. Attached is a copy of Will Wilson's affidavit of September 15, 1971, respecting an authorization letter dated June 16, 1969, in which he stated that he had authorized me to sign letters of this nature.

/s/ Henry E. Peterson
HENRY E. PETERSEN
Assistant Attorney General
Criminal Division

6. Mr. Lindenbaum's affidavit said:

AFFIDAVIT

District of Columbia:

Sol Lindenbaum being duly sworn, deposes and says:

I am Executive Assistant to the Attorney General of the United States. On April 29, 1970, the Attorney General approved a request for authorization

initialed memorandum [7] show, the Attorney General then considered the application and sent a memorandum to Mr. Wilson reciting "Pursuant to the powers conferred on me by Section 2516 of Title 18, United States Code, you are hereby specially designated to authorize Calvin K. Hamilton [8] to make the above described application." Mr. Peterson thereupon sent Mr. Hamilton a letter of authorization to seek the wiretap order, signing Mr. Wilson's name.

The foregoing demonstrates that, like the authorization to apply for the wireered in United States v. Pisacano, 459 F.2d 259 (2nd Cir., 1972); United States v. Aquino, 338 F.Supp. at 1081; United States v. Cihal, 336 F.Supp. at 264–265; and United States v. LaGorga, 336 F. Supp. 190, 194–195 (W.D.Pa.1971), the present case differs from the *Robinson* situation in a very essential way: in *Robinson* the authorization was approved only by two officials not mentioned in the Act, the Attorney General's personal assistant and the Deputy Assistant; here the authorization was personally approved by Attorney General Mitchell.

Perhaps the most illuminating of the foregoing cases is Chief Judge Friendly's opinion in *Pisacano*. The three authorizations involved in that case had received the same three-tiered investigation described above before being sent to the Office of the Attorney General. All three authorizations took the form of memoranda from Mr. Mitchell "designating" Mr. Wilson to authorize the application. Mr. Mitchell personally initialed one memorandum, the second was signed by Mr. Lindenbaum at Mr. Mitchell's direction, and the third was signed by Mr. Lindenbaum upon his own conclusion from his knowledge of Mr. Mitchell's criteria.

Judge Friendly for the court approved all three authorizations. He found from the affidavits of Lindenbaum and others that Mitchell's memoranda "designating" Wilson to act never issued until the Attorney General had decided a wiretap was proper in the particular case. Judge Friendly therefore concluded that memoranda signed by Mr. Mitchell constituted authorizations, not designations, and as such satisfied the Act. *But see* United States v. Casale, 341 F.Supp. 374 (M.D. Pa., 1972). Indeed, he found that even Lindenbaum's lone actions satisfied the Act since they were taken pursuant to " 'a unitary policy in the use of the awesome power conferred' in Title III

---

to make application for an interception order with respect to a certain telephone in Kansas City, Missouri. Attached is a copy of the Attorney General's personally initialed memorandum of that date to Will Wilson reflecting his favorable action on the request.

/s/ Sol Lindenbaum
SOL LINDENBAUM
Executive Assistant to the Attorney General of the United States

7. Mr. Mitchell's memorandum to Mr. Wilson stated:

Date: April 29, 1970
TO: Will Wilson
Assistant Attorney General
Criminal Division
FROM: John N. Mitchell
Attorney General
SUBJ: *Interception Order Authorization*

This is with regard to your recommendation that Calvin K. Hamilton, Assistant United States Attorney, Kansas City, Missouri, be authorized to make application for an interception order under 18 U.S.C. 2518, permitting the interception of wire communications for a twenty (20) day period from a telephone bearing the number 523–1354, located at 7015 Monroe Street, Kansas City, Missouri, in connection with the investigation into possible violations of 21 U.S.C. § 174 and 26 U.S.C. 4704, 4705 and 7237 by Eugene James Richardson and others as yet unknown.

Pursuant to the powers conferred on me by Section 2516 of Title 18, United States Code, you are hereby specially designated to authorize Calvin K. Hamilton to make the above-described application.

Mr. Mitchell's initials were written over his name at the top of the memorandum.

8. Hamilton then was Assistant United States Attorney for the Western District of Missouri.

. . . [that] 'assured that the application was deemed warranted in this particular case and was not "routinely" made by the Assistant Attorney General's deputy. . . .'" United States v. Pisacano, 459 F.2d at 259.

■ Of course, we are not here faced with a solitary action by Mr. Lindenbaum and therefore we need not reach that question. Mr. Mitchell acted personally in this case, and we agree with Judge Friendly that, since § 2516 authorized either Mr. Mitchell or Mr. Wilson to act, the Act is satisfied by Mr. Mitchell having personally determined that the authorization should issue.[9]

Because Mr. Mitchell did approve the application, it is unimportant that Mr. Wilson's ministerial act of sending a letter of approval to Mr. Hamilton was actually signed by Mr. Peterson, and it is irrelevant that the application and order recited the authorizing officer as Mr. Wilson rather than Mr. Mitchell. *Accord,* United States v. Pisacano, 459 F.2d at 259, n. 5. *But see* United States v. Focarile, 340 F.Supp. 1033 (D.Md.1972). The requirement in 18 U.S.C. § 2518 that the authorizing officer be named was designed to insure that decisions to wiretap were made by the named officials and did not reach into the lower echelons of command. That requirement should not be construed so inflexibly as to invalidate a wiretap application personally authorized by the Attorney General of the United States simply because the request recites the Assistant Attorney General as the applying officer.

## II. Minimization Issue

■ The touchstone for deciding the minimization issue is that it rests on a statutory command and therefore turns on the intent of Congress in issuing that directive. The constitutional question of the discreteness required of a wiretap is a separate question discussed *infra.* Also, the fact the wiretap warrant included a command to "minimize" is directly attributable to the statutory requirement that the order so specify. Accordingly, we turn to the Act's provisions and history which, when read together, indicate that the minimization requirement of 18 U.S.C. § 2518(5) is nothing more than a command to limit surveillance as much as possible in the circumstances, *i. e.,* the minimization question must be considered on a "case-by-case basis. . . ." Senate Report No. 1097, 1968 U.S. Code Cong. & Adm.News, at 2190.

■ In making this case-by-case inquiry, we also must be mindful that the statute's framers recognized that interceptions which might be excessive in some circumstances might be appropriate in others. As the favorable committee report said of minimization:

"Where it is necessary to obtain coverage to only one meeting, the order should not authorize additional surveillance. Where a course of conduct embracing multiple parties and extending over a period of time is involved, the order may properly authorize proportionately longer surveillance. . . What is important is that the facts in the application on a case-by-case basis justify the period of time of the surveillance."

*Id.* (citations omitted). Accordingly, where, as here, the investigation is of an organized criminal conspiracy con-

---

9. Aside from this factual determination of the nature of Mr. Mitchell's actions, it is important to note, as Judge Friendly did in *Pisacano,* that the legislative history speaks of burdening the Attorney General not with knowledge of the minutiae of each application, but with insuring that each authorization adheres to a unitary policy for the use of wiretapping:

"This provision centralizes in a publicly responsible official subject to the political process the formulation of law enforcement policy on the use of electronic surveillance techniques. Centralization will avoid the possibility that divergent practices might develop. Should abuses occur, the lines of responsibility lead to an identifiable person. This provision in itself should go a long way toward guaranteeing that no abuses will happen."
S.Rep. 1097, 1968 U.S.Code Cong. & Adm.News 2112, 2185.

versing in a colloquial code, surveillance of most of the telephone calls made during several days does not constitute a failure to minimize simply because in retrospect it can be seen that a substantial portion of them had no evidentiary or investigative value. *Accord,* United States v. Focarile, 340 F.Supp. 1033; United States v. LaGorga, 336 F.Supp. at 195–197.

We recognize that the present case involves an extensive use of electronic eavesdropping. The order was approved by Judge Hunter at 9:00 A.M., April 30, 1970, the tap commenced on that date, and it continued until midnight, May 19, 1970. The tap recorded conversations almost, if not in fact, continuously, producing 90 reels of recorded conversations. Apparently there were irrelevant conversations recorded.

Nevertheless, it must be pointed out that Judge Hunter, with his characteristic care for detail, exercised great caution not only in ordering the wiretap, but also in supervising the interceptions. He limited the order to 20 rather than the permissible 30 days. No renewal of the order was requested. He required reports from the U.S. Attorney at five-day intervals [10] in order to oversee administration of the tap and to terminate it when the investigation succeeded. He also meticulously gathered an inventory of all taped conversations and promptly sealed them.

Under these circumstances, the only complaint that can be made against the breadth of this wiretap is that the inherent nature of strategic electronic surveillance renders it unusable in investigating organized criminal conspiracies such as that in this case. As we demonstrated above, that clearly was not the conclusion of the framers of Section 2518(5). Congress apparently concluded, as did Judge Weis in United States v. LaGorga, *supra,* that:

> "it is often impossible to determine that a particular telephone conversation would be irrelevant and harmless until it has been terminated.
>
> . . . . . . .
>
> It is all well and good to say, after the fact, that certain conversations were irrelevant and should have been terminated. However, the monitoring agents are not gifted with prescience and cannot be expected to know in advance what direction the conversation will take."

336 F.Supp. at 196.

Furthermore, even if the surveillance in this case did reflect a failure to minimize, it would not follow that Congress intended that as a consequence all the evidence obtained should be suppressed. Quite the contrary, 18 U.S.C. § 2517 manifests an intent to utilize *all* the evidence obtained by eavesdropping, and § 2517(5) expressly permits the use in court of evidence obtained by wiretap of a crime other than the crime upon which the court order was premised. Clearly Congress did not intend that evidence directly within the ambit of a lawful order should be suppressed because the officers, while awaiting the incriminating evidence, also gathered extraneous conversations. The nonincriminating evidence could be suppressed pursuant to 18 U.S.C. § 2518(10) (a), but the conversations the warrant contemplated overhearing would be admitted.[11] If appellants, and the unindicted persons whose conversations were overheard,

---

10. Assistant U. S. Attorney Hamilton reported to Judge Hunter on May 6, 11, 18 and 21. The May 18 date was postponed from May 16 due to the absence of a court reporter on the 16th. The transcripts of these four reports, and Judge Hunter's inquiries at each hearing, forwarded to this court under seal, have received our scrutiny. They attest to Judge Hunter's concern that the procedures comported with the statute.

11. *Accord,* United States v. LaGorga, 336 F.Supp. at 196–197; United States v. King, 335 F.Supp. 523, 543–545 (S.D. Cal.1971). *Cf.,* United States v. Leta, 332 F.Supp. 1357, 1360 (M.D.Pa.1971). *See* United States v. Sklaroff, 323 F. Supp. 296, 316–317 (S.D.Fla.1971). *Contra,* United States v. Scott, 331 F. Supp. 233 (D.D.C.1971). *But cf.,* State v. Molinaro, 117 N.J.Super. 276, 284 A.2d 385 (1971).

have any remedy under Title III other than the suppression of conversations outside the warrant's scope, it lies in § 2520 as a civil suit against the investigating officers alleging that they exceeded their authority. *See* United States v. LaGorga, 336 F.Supp. at 196–197.

### III. Constitutionality of Title III

Having determined that the application for this wiretap order was properly authorized by the Attorney General and that the conduct of the eavesdropping did not, in the circumstances, reflect a failure to minimize the interceptions, we now direct our attention to appellants' last argument that this wiretapping search was invalid, to wit: their contention that the wiretapping enabling act is facially unconstitutional. We note at the outset that this case involves neither evidence of a crime other than that for which the wiretap order was procured, nor an emergency wiretap consummated prior to judicial authorization. Accordingly, we express no opinion as to those sections of the Act. *See* 18 U.S.C. §§ 2517(5); 2518(7). We are here concerned only with the basic thrust of the Act's wiretap provisions. We note also that every court having decided the question has affirmed the Act's constitutionality.[12] Indeed the one circuit court case on the question involved the very wiretap here in question, and the appellant in that case is also an appellant in this case. *See* United States v. Cox, 449 F.2d 679 (10th Cir. 1971), cert. denied, 406 U.S. 934, 92 S.Ct. 1783, 32 L.Ed.2d 136 (1972).[13]

Appellants' first broad contention asserts that wiretapping and eavesdropping are inherently unconstitutional as violative of First Amendment freedom of speech, Fourth Amendment protection from unreasonable searches, Fifth Amendment protection from self-incrimination, the Fifth Amendment guarantee of due process, Sixth Amendment right to counsel, and the penumbral right of privacy. The short answer to this blunderbuss assertion is that the Supreme Court has expressly held that some forms of eavesdropping are constitutional when accompanied by appropriate procedural safeguards. *See* Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966). *Cf.*, Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The only question left for this court to answer, then, is whether the Act here in question, Title III of the Omnibus Crime Control Act of 1968, 18 U.S.C. §§ 2515–18, contains the safeguards which the Supreme Court has said are essential.

While the Supreme Court has never specifically enumerated certain criteria which, if met, would enable an eavesdropping statute to withstand constitutional scrutiny, the flaws which the five-man majority saw in the New York wiretap statute can, viewed against *Osborn* and *Katz*, be seen as such a list. *See* Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967). Those opinions would require: (1) that the applicant procure "[from] a neutral and detached authority," which *Katz* says must be a judicial officer, an order

12. United States v. Cox, 449 F.2d 679 (10th Cir. 1971), cert. denied, 406 U.S. 934, 92 S.Ct. 1783, 32 L.Ed.2d 136 (1972); United States v. Forcarile, 340 F.Supp. 1033 (D.Md.1972); United States v. LaGorga, 336 F.Supp. 190 (W.D.Pa.1971); United States v. Perillo, 333 F.Supp. 914 (D.Del.1971); United States v. Leta, 332 F.Supp. 1357, 1359–1361 (M.D.Pa.1971); United States v. Scott, 331 F.Supp. 233, 238–241 (D.D.C.1971); United States v. Cantor, 328 F.Supp. 561 (E.D.Pa.1971); United States v. Sklaroff, 323 F.Supp. 296 (S.D.Fla.1971); United States v. Escandar, 319 F.Supp. 295 (S.D.Fla.

1970), rev'd on other grounds *sub nom*, United States v. Robinson, No. 71–1058 (5th Cir., Jan. 12, 1972).

13. The wiretap in the present case was placed on a telephone in Kansas City, Missouri, to investigate narcotics violations, but it also yielded information that Eddie David Cox, a defendant herein, was involved in a bank robbery in Kansas. The robbery charges were thus tried in the District of Kansas and appealed to the Tenth Circuit Court of Appeals, and the constitutionality of the wiretap in this case was litigated in those proceedings.

permitting the wiretap; (2) that to procure the order, or renewal thereof, the applicant must show probable cause that an offense has been or is being committed and must state with particularity (3) the offense being investigated, (4) the place being searched (*i. e.*, the telephone being tapped or place being bugged), and (5) the things (conversations) to be seized; (6) that the order must be executed with dispatch; (7) that it must not continue beyond the procurement of the conversation sought and thereby become "a series of intrusions, searches, and seizures pursuant to a single showing of probable cause;" (8) that it overcome the lack of notice by requiring a showing of exigent circumstances as a precondition to the order; and (9) that it require a return on the warrant.[14]

"Congress in passing the Act considered carefully the[se] decisions of the Supreme Court . . . and made an intensive effort to comply with the standards which had been enunciated in these cases." United States v. Cox, 449 F.2d 679, 683 (10th Cir. 1971), cert. denied, 406 U.S. 934, 92 S.Ct. 1783, 32 L.Ed.2d 136 (1972). *See* Senate Report No. 1097, 1968 U.S.Code Cong. & Adm.News, p. 2112 et seq. We think reference to those sections of the Act listed in the margin with each criterion will show that Congress was successful in this effort.

The only facet of the Act which can be seriously questioned as failing the rigors of *Berger* is the provision allowing surveillance orders to last thirty days. The doubt as to that section stems primarily from the fact the only eavesdropping the Supreme Court has approved have been interceptions of single conversations.[15] Indeed, the Court in *Berger* reserved its strongest criticism of the New York law for the section allowing a dragnet-like surveillance for periods of sixty days and longer, saying it was, like the odius general warrants of colonial times,[16] "the equivalent of a series of intrusions, searches, and seizures pursuant to a single showing of probable cause." [17]

We do not, however, read *Osborn, Katz* and *Berger* as holding that only "rifle shot" eavesdrops are constitutionally permissible. The dragnet nature of the New York law resulted not only from the duration of the warrant, but also from the failure to confine the investigator's latitude with the various safeguards which the court noted that law did not contain.[18] Having required each of the procedural safeguards mentioned in *Berger,* we do not think Title III is rendered unconstitutional solely because it authorizes wiretaps which may last several days and encompass multiple conversations. The wiretap in the present case illustrates the reasonableness of such electronic searches. Here, the application made a probable cause showing of a narcotics distribution network with Richardson as its focal point. It demonstrated the exigency of gathering evidence as to all the tentacles of that enterprise by monitor-

---

14. *See* Berger v. New York, 388 U.S. at 54–60, 87 S.Ct. at 1873. See, in connection with each of the above-enumerated criteria, respectively, the following sections of 18 U.S.C.:
 (1) § 2516;
 (2) § 2518(1) (f) and (2);
 (3) § 2518(1) (b) (i);
 (4) § 2518(1) (b) (iii), (4) (a) and (4) (b);
 (5) § 2518(1) (b) (iii) and (4) (c);
 (6) § 2518(6);
 (7) § 2518(1) (d), (4) (e) and (5);
 (8) § 2518(1) (c), (3) (c) and (8) (d);
 (9) § 2518(8) (a) and (8) (b).

15. *See* Osborn v. United States, *supra*; Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); On Lee v. United States, 343 U.S. 747, 72 S.Ct. 798, 96 L.Ed. 1270 (1952); Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942). *Cf.,* Katz v. United States, *supra.*

16. Berger v. New York, 388 U.S. at 58, 87 S.Ct. 1873.

17. *Id.*, at 59, 87 S.Ct. at 1883.

18. *See id.*, at 54–60, 87 S.Ct. at 1873.

ing its communications center, and the tap was administered with each safeguard listed in *Berger*. Accordingly, this wiretap was not simply a "blanket grant of permission to eavesdrop" [19] upon Richardson pursuant to one showing of probable cause as to him. It was a continuing search of several persons' conversations pursuant to a multiple showing of probable cause reaching several people using that telephone. Furthermore, as shown above, the District Judge took the additional precaution of maintaining close supervision of the search by requiring frequent reports. Under such circumstances no "fishing expedition" can occur.

■ Obviously an electronic search extending over a period of time will encompass overhearing irrelevant conversations, but the search of a building will likewise involve seeing and hearing irrelevant objects and conversations.[20] We therefore reject the assertion that only single-conversation interceptions are constitutionally permissible, and we agree with the Tenth Circuit that *Berger*, *Katz* and *Osborn* do not indicate the contrary.[21] We read those opinions as saying that "adequate judicial supervision or protective procedures" [22] such as are required by this Act provide the reasonableness which the Fourth Amendment requires. We therefore hold that 18 U.S.C. §§ 2515–18 are constitutional.

## IV. Presumption of Importation of Narcotics

We turn next to the various contentions relating to the presumptions erected by 21 U.S.C. § 174 and 26 U.S.C. § 4704(a).

■ The first argument is that Cox, Branch and Miller cannot be presumed, pursuant to § 174, to know the heroin they possessed was illegally imported because, it is alleged, the government failed to prove the basic fact of possession. None of these convicted conspirators were caught possessing heroin, so the usual evidence of scientific testing was absent. The prosecution relied instead upon the inexpert testimony of two co-conspirators turned informers who (1) said they had seen the defendants possessing substances they knew to be heroin, (2) admitted they personally had used heroin purchased from the defendants, and (3) identified the voices and colloquialisms in wiretapped conversations as being the defendants discussing their possession, use and sale of heroin. Additionally, scientific testing of heroin seized from other co-conspirators confirmed this testimony that what the conspirators dealt in was heroin. We think the foregoing evidence is sufficient for the jury to find the basic fact that these three defendants possessed heroin.[23]

19. *Id.*, at 60, 87 S.Ct. at 1884.

20. *See* Berger v. New York, 388 U.S. at 108, 87 S.Ct. at 1909 (White J., dissenting) ; United States v. Perillo, 333 F. Supp. at 922.

21. The Tenth Circuit in *Cox* summarized its reading of those cases as follows: "the nature and probable consequence of authorized wiretapping is discovery of unanticipated and undescribed communications. . . . If wiretapping is to be validated, and *Berger*, *Osborn* and *Katz* recognize its validity, then . . . Congress has dealt with the problem about as well as could have been expected considering the nature and character of the subject matter and its consequential incidents." 449 F.2d at 687.

22. Berger v. New York, 388 U.S. at 60, 87 S.Ct. at 1884.

23. Since appellant Dearborn was arrested in possession of a substance chemically analyzed as heroin, the foregoing argument is inapplicable to his § 174 conviction. Instead, he contends his conviction under § 4704(a) is vitiated by the failure of the prosecution to offer any proof that the seized heroin was unstamped. That argument, however, was conclusively answered in Turner v. United States, 396 U.S. 398, 419–422, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970). *Turner* also disposes of the contention of all four appellants that the § 174 presumption violates the Due Process and Confrontation Clauses because, they allege, the relation between the basic fact of possession and

### V. Instructions

All four appellants next contend the instructions were fatally erroneous in failing to use the words of the instructions approved in Turner v. United States, 396 U.S. 398, 406–407, 90 S.Ct. 642, 24 L.Ed.2d (1970), which emphasized that despite the permissibility of relying on the presumption; the jury, as the sole judge of the facts, is the final arbiter of the probative force of the presumption and can reject it as failing the burden of proving each element of the crime beyond a reasonable doubt. We think, however, that the Supreme Court's approval of the instructions in *Turner* in no way limited instructions to use of those very words. Applying the usual test, the instructions here, when considered as a whole, fairly conveyed the governing legal principle to the jury. In any event, the defendants' failure specifically to raise this objection in a timely manner precludes their making this contention now.[24]

### VI. Self-incrimination

The four appellants' final contention relating to the presumption created in § 174 is that it abridges the Fifth Amendment by creating a confessional dilemma like that denounced in the *Marchetti Trilogy*.[25] The statute provides that possession of heroin is sufficient to prove the possessor's knowledge of its illegal importation "unless the defendant explains the possession to the satisfaction of the jury," but the appellants submit the possessor could refute that presumption only by confessing either to stealing or otherwise receiving unstamped heroin in violation of 26 U.S.C. § 4704(a), or to manufacturing heroin from codeine or morphine in violation of 21 U.S.C. Ch. 11. Appellants therefore contend this statutory scheme presents the type of Hobson's choice proscribed by *Marchetti*.

The fallacy of that argument is that the Fifth Amendment precludes only compulsory self-incrimination while "[t]he statute compels nothing." Yee Hem v. United States, 268 U.S. 178, 185, 45 S.Ct. 470, 69 L.Ed. 904 (1925). § 174 merely permits a jury to infer illegal importation and does so solely because it is virtually impossible for domestically possessed heroin not to be illegally imported. Turner v. United States, 396 U.S. at 408–418, 90 S.Ct. 642.

> "The same situation might present itself if there were no statutory presumption and a *prima facie* case of concealment with knowledge of unlawful importation were made by the evidence. The necessity of an explanation by the accused would be quite as compelling in that case as in this; but the constraint upon him to give testimony would arise there, as it arises here, simply from the force of circumstances and not from any form of compulsion forbidden by the Constitution."

Yee Hem v. United States, 268 U.S. at 185, 45 S.Ct. at 472.

### VII. The Conspiracy

Appellants Cox, Branch and Miller raise two other arguments for reversal of their convictions. They assign error first to the admission into evidence of sales of heroin by three persons the government said were members of the conspiracy and the appellants say were merely customers thereof. However, it is irrelevant whether those persons acted as co-conspiring sellers or as customers who procured from co-conspirators the heroin they independently resold.

the ultimate fact of knowledge of illegal importation is too tenuous to support a logical presumption. *See* 396 U.S. at 405–418, 90 S.Ct. 642.

24. The failure to question the instructions also precludes these appellants' contention that Judge Hunter erred in his instructions equating "dilute, mix and adulterate" heroin with "receiving, concealing, buying, selling or facilitating the transportation of" it.

25. Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968); Haynes v. United States, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968).

The evidence of those transactions is nevertheless admissible as showing sales of heroin by co-conspirators, either those three persons or the persons who were their sellers.

 The other assigned error is the refusal of the court to grant the pretrial motion for a severance upon the contention that two conspiracies were shown by defendant Miller's withdrawal before defendant Cox entered. It is settled law, however, that a new conspiracy is not necessarily created each time a member quits or joins an existing conspiracy. *See, e. g.,* United States v. Varelli, 407 F.2d 735, 742 (7th Cir. 1969). *See generally,* Isaacs v. United States, 301 F.2d 706 (8th Cir.), cert. denied, 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58 (1962).

*VIII. Dearborn's Other Contentions*

 Appellant Dearborn also raised as additional contentions: (1) that having sentenced Dearborn's wife and read her presentence report, Judge Hunter should have recused himself upon Dearborn's motion; (2) that since the conceded ringleader of the conspiracy, Richardson, received a 20-year sentence upon his guilty plea, Dearborn's total sentence of 25 years contravenes the Eighth Amendment by punishing his insistence on a jury trial; (3) that the search warrant which yielded the heroin in his possession was invalid as being based on information from an informer that was insufficient in light of Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), and Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); and (4) that the fruits of the search are tainted by the allegedly illegal manner in which the warrant was enforced.[26]

We find none of these contentions availing to Dearborn. First, when Judge Hunter sentenced this appellant's wife

he merely read in her presentence report an account of appellant's alleged activities which he could have read in a newspaper. This is hardly the personal bias requisite for recusal. Second, the alleged ringleader, Richardson, was sentenced to twenty years upon his guilty plea to Count I, the precise term given Dearborn on Count I. The concurrent twenty years and consecutive five years stem from convictions on two other counts, not from Dearborn's refusal to plead guilty. Third, the affidavit on which the warrant rested did not rely solely upon the informer's testimony. The affidavit also presented the substance of a wiretapped conversation in which Dearborn said the heroin was on a shelf in his house, precisely where it was found. Since, as we previously explained, the wiretap was permissible, this message clearly is sufficient to corroborate the informer.

 Finally, we reject the contention the search was illegally conducted. Dearborn contends that since the warrant was directed "To U.S. Marshal or other authorized officer," it was illegal for it to have been enforced by two Bureau of Narcotics Agents assisted by two city policemen. That contention, however, is fully answered by 18 U.S.C. § 3105:

> "A search warrant may in all cases be served by any of the officers mentioned in its direction by an officer authorized by law to serve such warrant [as are Narcotics Agents, 21 U.S. C. § 878(2)], but by no other person, except in aid of the officer on his requiring it, he being present and acting in its execution."

Appellant also contends the two officers at the rear of the door without the warrant illegally entered before the two at the front door with the warrant, but Judge Hunter expressly found the facts

---

26. Dearborn also contends that putting into evidence narcotics paraphernalia seized upon his arrest constituted admission of irrelevant, inflammatory evidence of an unindicted offense. This court, however, has previously rejected that contention, holding the paraphernalia to be admissible in prosecutions for heroin traffic as instrumentalities of the crime. United States v. Bridges, 419 F.2d 963, 967–968 (8th Cir. 1969).

to be to the contrary. Similarly, Dearborn contends the officers were not justified in their forcible entry after twice announcing their purpose and hearing indecipherable conversation inside. We think, however, that the ease with which narcotics are destroyed justified the entry when it was clear persons were present inside and aware of the officer's presence, but refusing to acknowledge the request for entry. *Cf.,* Ker v. California, 374 U.S. 23, 37–41, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

## CONCLUSION

In sum, we find insufficient merit in any of the contentions of the four appellants to require reversal and therefore affirm each conviction.