**UNITED STATES of America,**

v.

**Alphonse SISCA et al., Defendants.**

**No. 72 Cr. 1159.**

United States District Court,
S. D. New York.

June 25, 1973.

Whitney North Seymour, Jr., U. S. Atty., by W. Cullen MacDonald, Asst. U. S. Atty., for the Government.

Lenefsky, Gallina, Mass, Berne & Hoffman, New York City, for defendants Sisca, Abraham, Grant, Logan, Hoke and E. Holder; Gino E. Gallina, Jeffrey C. Hoffman, John L. Pollok, Robert H. Kiernan, New York City, of counsel.

Edward Gasthalter, New York City, for defendant Brown.

Robert P. Leighton, New York City, for defendant Ellington.

Alvin Geller, New York City, for defendant C. Holder.

Gilbert Epstein, New York City, for defendant McBride.

## OPINION

FREDERICK van PELT BRYAN, District Judge:

At the conclusion of a six-week trial before me, the jury returned the following verdicts:

As to defendants Grant, E. Holder, Brown, Ellington, Logan, McBride and C. Holder, guilty of (1) conspiracy to violate the narcotics laws, 21 U.S.C. Section 846, and (2) the use of a telephone to further such violations, 21 U.S.C. Section 843(b).

As to defendant Abraham, guilty of (1) conspiracy to violate the narcotics laws; (2) use of a telephone to further such violations and (3) continuous dealings in narcotics in concert with 5 or more other persons as to whom he acted as organizer, manager or supervisor, 21 U.S.C. Section 848.

As to defendant Sisca, (1) guilty of conspiracy to violate the narcotics laws and (2) not guilty of the use of the telephone to further such violations.

As to defendant Hoke, guilty of conspiracy to violate the narcotics laws.[1]

During the course of the trial tapes of 21 conversations carried on over the telephone listed in the name of defendant Carol Holder, 20 conversations over the telephone listed in the name of defendant Margaret Logan, and one conversation on the telephone listed in the name of defendant Lavern McBride were introduced in evidence by the prosecution and played before the jury. These conversations had been intercepted pursuant to wiretap orders issued by a

Judge of the County Court of Westchester County in the case of the Holder tap, and by a Justice of the New York Supreme Court, Bronx County, in the case of the Logan and McBride taps. The intercepted communications in evidence were a significant part of the prosecution's case.

The Jury was selected and sworn on January 16, 1973. On January 24, 1973, well after the taking of testimony was under way, counsel representing Errol Holder moved for the first time to suppress all conversations intercepted over the Holder telephone upon the ground of a claimed "failure to minimize the interception of communications not otherwise subject to interception." Thereafter, similar motions were made with respect to conversations intercepted under the Logan and McBride wiretaps. These motions were joined in by all defendants who had participated in the various conversations admitted in evidence. A hearing was requested as to the facts of minimization.

The Government opposed the motions, both on the ground that they were made too late and the defendants had waived their rights to make them, and on the merits. Decision was reserved until the conclusion of the trial. After the jury had returned its verdict, evidentiary hearings were held to determine such facts with respect to the minimization claims as had not been brought out during the trial and thus to complete the record on the subject. The motions to suppress are now before me for decision.

The interception of wire communications and authorizations therefor are governed by Chapter 119 of Title 18 U.S.Code. Section 2518(5) of that chapter provides that every order for interception of a wire communication

shall contain a provision that the authorization to intercept . . .

---

[1.] A verdict of acquittal was directed by the Court on counts of narcotics conspiracy and use of a telephone to further the conspiracy, against defendants Johnson, Hartley, Bazemore and Sullivan; and on

the count of unlawful use of a telephone against defendant Hoke. Counts against defendant Cleo Dingle were severed. Defendants Castalozzo, Sizemore and Owens were fugitives and were not tried.

shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter. . . . The New York Criminal Procedure Law, which "virtually tracks the language" of Chapter 119,[2] contains a provision to the same effect. New York Criminal Procedure Law § 700.30(7).

The wiretap orders issued in this case contained such provision.[3] The moving defendants contend that these provisions of the interception orders were not complied with and that the intercepted conversations should therefore be suppressed.

The evidence adduced at the trial established a widespread and complicated conspiracy among the defendants and others to distribute heroin and cocaine on a large scale. The conspiracy was a narcotics distribution operation by which drugs were obtained from major wholesalers and passed on to retailers for retail sale. Operations were largely in Manhattan, the Bronx and southern Westchester. The evidence primarily concerned operations over a period from mid-August to mid-December, 1971.

Heroin in quantities as large as 8 kilograms (at $26,000 per kilo) were purchased periodically from major wholesalers by defendant Abraham, who appears to have been the key man and organizer of the operation. The other conspirators played various roles, as links with wholesalers, distributors, supervisors or participants in cutting mill operations, couriers and contact people.

Lengthy and intensive investigation by law enforcement officers, both state and federal, established the connections between the co-conspirators, numerous meetings and arrangements between them in furtherance of the conspiracy, and its objectives and its method of operation. The investigation resulted in the seizure, pursuant to search warrant, of large quantities of narcotic drugs, adulterants, dilutants, packaging materials and paraphernalia, cash, data concerning financial transactions, and weapons, in apartments and houses occupied by various of the defendants; a raid pursuant to search warrant on a cutting mill in full operation and the arrest of six women who were engaged in diluting and packaging heroin and cocaine for retail distribution, and the arrest of several defendants and co-conspirators, with large quantities of narcotics in their possession.

There are two issues presented here:

1. Did the defendants waive any rights to move to suppress the intercepted conversations for failure to minimize by not making such motions before trial?

2. Are the defendants or any of them[4] entitled to suppression of the intercepted conversations admitted in evidence for failure to comply with the minimization provisions of the statute and the wiretap orders?

I

18 U.S.C. § 2518(10)(a) mandates that a motion "to suppress the contents of any intercepted wire or oral communication . . . shall be made before the trial, hearing or proceeding, unless there was no opportunity to make such motion or the person was not aware of the grounds of the motion."[5] It cannot be disputed that no pretrial motion on the ground of failure to minimize was made in the case at bar.

---

2. United States v. Tortorello, 480 F.2d 764, 772 (2d Cir., 1973).

3. While the original McBride order, issued Nov. 8, 1971, contained such a requirement, the modified order, issued Nov. 17, 1971, did not. However, it can be considered to incorporate the minimization provision of the earlier order. *See* United States v. Bynum, 475 F.2d 832, 835 (2d Cir. 1973).

4. In view of the result reached here it is unnecessary to discuss the question of the standing of some of the defendants to make the motions.

5. See also Rules 12 and 41(f), F.R.Cr.P.

The indictment in this case was filed on October 16, 1972. Defendants were arraigned on October 30, 1972. The case was then assigned to me and defendants were given the usual 10 days for motions, which was extended until November 21, 1972. Trial was initially set for January 3, 1973 but was postponed at the defendants' request until January 16, 1973. Some 8 pretrial conferences and hearings were held prior to trial, to dispose fully of pretrial motions and issues.

On November 8, 1972 the Government advised the defendants in writing that, among other things, "all tapes of conversations electronically recorded under Court order" would be available to defendants for inspection and copying. Thereafter, a voluminous exhibit (Ex. 59 at trial), containing the wiretap orders involved on these motions and the papers supporting them together with the logs which had been made of the Holder tap, was served on the defendants by the Government. After some delay, counsel for defendants began the process of listening to the tapes and listened to a large sample of them.

Motions to suppress the Holder and Logan interceptions were filed on November 16, 1972 and to suppress the McBride interceptions on November 20 and December 7, 1972. These suppression motions were made on a variety of grounds, including lack of probable cause for the issuance of the wiretap orders. But there is not the slightest question that no claim was made, or even suggested, in the moving papers that there had been a failure to comply with minimization requirements or that this was a ground for suppression. These pretrial suppression motions were all denied by the Court on December 18, 1972.[6]

At a pretrial conference of December 27, 1972, held primarily to determine whether the trial, then set for January 3, 1973, should be adjourned at defendants' request, it was apparent that Mr. Gallina and his associates, representing defendants Sisca, Abraham, Logan, Hoke, E. Holder and Grant, and also acting in this regard for other defendants, had listened to a substantial portion of the tapes—more than enough, in fact, to have a good knowledge of what they contained. Defendants also had copies of the log of the Holder tap, contemporaneously made by officers who had monitored the interception, which were quite sufficient to indicate any basis there was for the failure of minimization claim. At this conference, Mr. Gallina stated that from the listening which had been done, "We also discovered, to our chagrin, that the agents of the police who executed the warrants did not follow the directives of the warrant, did not follow the directive of federal law and that is minimization."

The Court directed: "Now, if, for example, you have any affirmative evidence which you claim presently justifies the suppression of anything, any of the taped materials, it seems to me quite clear that it ought to be raised forthwith." (Minutes of Dec. 17, 1972, at 24–25)

The request for an adjournment was on the basis that defense counsel desired further time to continue listening to the tapes on the minimization and other questions. After a further pretrial conference on Dec. 29, 1972, the Court granted an adjournment of the trial to January 15, 1973, then two and a half weeks off.

Nevertheless, no minimization motions were made prior to the commencement of the trial.

It was not until January 23, five trial days after the trial had commenced and the jury had been selected and sworn, that defense counsel referred to minimization again. When testimony was being given as to the Logan tap, defend-

---

6. A pretrial motion to suppress tapes of conversations over another telephone was granted on the ground of lack of probable cause to support the wiretap order.

ants for the first time sought discovery of the logs of this tap. Mr. Pollok, representing the defendant Errol Holder, stated that while the Holder logs indicated lack of minimization, he did not know about the Logan and McBride taps. The following exchange then took place:

"The Court: You have every way of knowing. You have heard the tapes. What are you talking about?

\* \* \* \* \* \*

Mr. MacDonald: The record should reflect, I believe that there has been no such motion based upon minimization in this case.

The Court: No. There has been none. There has been mention of it, but that is all.

Mr. Pollok: Your Honor, I was waiting for the appropriate time.

The Court: Well, the appropriate time was pretrial, and not now.

Mr. Pollok: I respectfully differ with your Honor." (Trial Tr. 749–50)

The next day, January 24, 1973, Mr. Pollok moved for the first time to suppress the Holder taps. Later in the trial motions to suppress the Logan and McBride taps were also made.

The motions made at trial are the only motions now before the Court. Thus, there can be no dispute that no motions whatsoever, raising the minimization question, were made before the trial started.

There remain the questions of whether or not there was "no opportunity to make such motion[s]" before trial or whether defendants "were not aware of the grounds of the motion[s]", 18 U.S.C. § 2518(10)(a).

I find that there was ample opportunity for defendants to make these minimization motions before trial. Defendants were fully aware of the grounds of such motions, as was conclusively demonstrated by their discussion of the issue in the pretrial conference of December 27, 1972 almost three weeks before the trial commenced and more than four weeks before the motions at trial were made.

■ The time limitations prescribed in 18 U.S.C. § 2518(10)(a) for motions to suppress intercepted communications are no mere idle technical requirements. These limitations were imposed for sound policy reasons and should be enforced.

There is no need to stress the desirability and importance of having such motions made and determined prior to the commencement of the trial. Delay in making such motions until after the trial has commenced where, as here, the necessary material on which to ground them was fully available to defendants in ample time to permit them to move, may have serious consequences. These consequences include long delay and interruptions in the course of the trial; the denial to the Government of an opportunity to determine what evidence it can or cannot adduce at the trial in the light of the court's pretrial rulings on such motions; whatever legal consequences in terms of the due process and double jeopardy clauses of the Constitution may result from the impanelment of the jury; and the serious question of whether the Government could appeal under Section 2518(10)(b) from an order granting a motion to suppress after a jury was impanelled.

The report of the Senate Judiciary Committee on the Omnibus Crime Control Bill of 1968, S.Rep. No. 1097, which includes Section 2518, makes clear the importance placed by Congress on compliance with the pretrial requirements of § 2518(10)(a). Section 2518(9) requires the defendant to be furnished with copies of the court orders under which the interception was authorized not less than ten days before trial. Here defendants were furnished with such copies long before that. The report points out that "The 10-day period is designed to give the party an opportunity to make a pretrial motion to suppress under paragraph 10(a), discussed below." 2 U.S.Code Cong. & Admin.

News, p. 2195 (1968). With respect to paragraph 10(a), the report states

> The motion must be made before the trial, hearing, or proceeding unless there was no opportunity to make the motion or the person was not aware of the grounds of the motion, for example, when no notice was given under paragraph (9), discussed above. Care must be exercised to avoid having a defendant defeat the right of appeal under paragraph (b), discussed below, by waiting until trial. [Giacona v. United States, 257 F.2d 450 (5th), certiorari denied, 358 U.S. 873, 79 S.Ct. 113, 3 L.Ed.2d 104 (1958).]" 2 U.S.Code Cong. & Admin.News p. 2195.

In the case at bar, all of the orders authorizing interception and the papers supporting them, all of the tapes of the intercepted conversations, and the complete logs of one of the interceptions were furnished or available to counsel for defendants almost two months before trial commenced. There was ample opportunity during the extensive discovery proceedings for the defendants to have obtained the logs of the other two tapes had they deemed them necessary. By December 27, 1972, almost three weeks before the trial, counsel for the defendants had already listened to some 200 hours of taped conversations and were fully aware of the minimization problem, as they indicated to the Court. The Court, having already denied a number of suppression motions on a variety of grounds, not including the lack of minimization, explicitly directed that any further suppression motions should be made forthwith. Yet, whatever the reason, counsel chose not to make such motions pretrial but delayed making them until the trial was well under way. It is plain that defendants failed to comply with the requirements of § 2518(10)(a) and waived their right to make such motions after trial had commenced.

United States v. Bynum, 475 F.2d 832 (2d Cir. 1973), on which defendants rely on the waiver issue, is clearly distinguishable and does not affect this result. In *Bynum* a pretrial motion to suppress on the ground of failure to minimize was duly made. Here there was no pretrial motion on this ground.

Nor does the proposition in Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) that courts should " 'indulge every reasonable presumption against waiver' of fundamental constitutional rights" aid the defendants here. The cases in this circuit subsequent to Johnson v. Zerbst have consistently held that objections to unlawfully seized evidence are waived where counsel failed to make a pretrial motion to suppress as required by the comparable provisions of Rule 41 F.R.Cr.P. United States v. Di Re, 159 F.2d 818, 820 (2d Cir. 1947) (dictum), aff'd, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948); United States v. Sansone, 231 F.2d 887, 891–892 (2d Cir.), cert. denied, 351 U.S. 987, 76 S.Ct. 1055, 100 L.Ed. 1500 (1956); United States v. Romero, 249 F.2d 371 (2d Cir. 1957); United States v. Montalvo, 271 F.2d 922, 926 (2d Cir. 1959), cert. denied, 361 U.S. 961, 80 S.Ct. 589, 4 L.Ed.2d 543 (1960); United States v. Di Donato, 301 F.2d 383, 384 (2d Cir.), cert. denied, 370 U.S. 917, 82 S.Ct. 1557, 8 L.Ed.2d 497 (1962); United States v. Watts, 319 F.2d 659 (2d Cir. 1963); United States v. Nicholas, 319 F.2d 697 (2d Cir.), cert. denied, 375 U.S. 933, 84 S.Ct. 337, 11 L.Ed.2d 265 (1963); United States v. Blackwood, 456 F.2d 526, 529 (2d Cir.), cert. denied, 409 U.S. 863, 93 S.Ct. 154, 34 L.Ed.2d 110 (1972). These holdings have renewed vitality in the light of Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), where the Court refused to apply the Johnson v. Zerbst standard to a waiver by consent of Fourth Amendment rights. *Cf.* Davis v. United States, 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973); Kaufman v. United States, 394 U.S. 217, 227 n. 8, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1970).

## II

The determination that defendants waived their rights to move to suppress

on failure of minimization grounds is dispositive of these motions. Ordinarily it would render further discussion unnecessary. However, in view of the importance and relative novelty of the minimization question and the evolving law on the subject, I deemed it desirable that all aspects of the question should be explored. In order that the record should be full and complete, I held a post-trial evidentiary hearing as to what was done to carry out minimization. The evidence adduced at that hearing supplemented evidence on the same subject at the trial. The following are the relevant facts insofar as they are shown by the record:

*The Holder Tap*

The Holder tap was authorized by order of Judge Sullivan of the Westchester County Court dated September 27, 1971. The order recited that there were "reasonable grounds to believe" that conversations of Errol Holder and other persons over telephone number 914–969–4368 (listed to Carol Holder at 430 Warburton Avenue, Yonkers) would secure evidence of violations of the narcotics laws. The order authorized the interception, overhearing, and recording of "any and all" telephone conversations over the Holder telephone, "specifically those conversations of . . . Errol Holder, Jr., a/k/a 'The Fox', and unknown persons, showing con-conspirators [sic], concerning the purchase, possession, sale and source of supply and distribution outlets of dangerous drugs and the identity of other principals in this criminal activity . . . ." The interception began the following day and continued until November 24, 1971.[7] Interception was made at a "plant" near the Holder residence. The tape recorder automatically recorded all incoming and outgoing calls. There was also a "pen register" which recorded the telephone numbers of all outgoing calls. Westchester County law enforcement officers

acting as monitors were present at the plant twelve to sixteen hours per day but the machines continued to operate automatically in their absence.

A log was kept of all calls, incoming as well as outgoing. Each call on a reel of tape was given a sequential number, and entries on the log noted the time of the call; whether it was incoming or outgoing, if the latter, the number called; and the names of the participants, if known or ascertainable from the conversation. Moreover, either a summary or rough transcript was prepared for each call. A notation "DNP" was made on the log if the call was "deemed not pertinent" by the monitoring officers.

The logs were prepared as follows: after each reel was full, it was replaced on the recording machine by a fresh reel. The full reel was placed on a second machine and played back. As it was played back the log was prepared. Memoranda were also regularly prepared stating the number of calls deemed pertinent on each reel.

The monitoring officers testified they had been instructed to shut the tape recorder off if a "privileged" call was made. This was defined as a call to a doctor, lawyer, priest, or the like. No such calls were identified by the monitoring officers. The tape recorder was never turned off to preclude the interception of any call, in whole or in part.

The calls intercepted on the Holder tap can be broken down as follows (all figures are approximate):

| | |
|---|---|
| Total calls | 1900 |
| Busy, wrong number, no answer | 700 |
| Information, time and weather | 85 |
| Actual Conversations Intercepted | 1115 |
| Number of calls noted as pertinent on memos | 250 |
| Number of calls marked DNP on logs | 450 |

*Logan Wiretap*

The Logan tap was authorized by order of Justice Kapelman of the New York Supreme Court, Bronx County, dated November 8, 1971.[8] The order re-

---

7. An extension order was issued on October 29, 1971.

8. A renewal order was signed December 7, 1971 for an additional 30 days.

cited that there were "reasonable grounds to believe that evidence of violations" of the narcotics law would be obtained by intercepting conversations over the telephone listed under the name of Margaret Logan, which was "being used by one WILLIE ABRAHAM, a/k/a 'J.C.' . . . ." It authorized the interception of "any and all" calls over that phone. The interception began that day and continued up until December 15, 1971, when Abraham, Logan and several other defendants were arrested. As on the Holder tap, the tape recorders automatically recorded all calls, although they could be shut off manually. The "plant" was manned around the clock, and a log was made of all calls. The notation NP was made on calls deemed by the monitors to be "not pertinent".

The officers manning the plant were New York City police who were instructed not to overhear privileged conversations, and a copy of the authorization order was posted at the plant. As with the Holder tap, the tape recorders were never shut off to avoid intercepting any call in whole or in part.

The calls overheard on the Logan tap can be broken down as follows:

| | |
|---|---:|
| Total calls | 1025 |
| Busy, wrong number, ring no answer | 300 |
| Information, time and weather | 65 |
| Actual Conversations Intercepted | 660 |
| Number of calls marked NP on logs | 131 |

### McBride Wiretap

The McBride wiretap was authorized by order of Justice Kapelman of the Supreme Court, Bronx County, dated November 8, 1971. The order recited that there were "reasonable grounds to believe" evidence of violations of New York narcotics laws would be obtained by intercepting conversations over 542–4514 "listed under the name of LAVERNE E. McBRIDE . . . and being used by the said LAVERNE E. McBRIDE. . . . ." It authorized the interception of "any and all" conversations "which may be reasonable for the purpose of obtaining evidence of the violation of the narcotics laws and conspiracy to commit the same. Interception continued from on or about that date until December 15, 1971. On November 17, 1971, amendment of the initial order was sought and obtained based on previously overheard conversations relating to the shooting of one "Pedro", a frequent user of the McBride telephone. The amendment authorized the overhearing of conversations relating to assault by use of a weapon.[9] The plant was manned around the clock, and logs were made which either noted the call or summarized it. Privileged conversations, the monitoring New York City officers were instructed, were to be shut off. The machine was shut off only during one call.

Calls overheard on the McBride tap can be broken down as follows:

| | |
|---|---:|
| Total calls | 680 |
| Busy, wrong number, ring no answer | 225 |
| Information, time and weather | 12 |
| Actual Conversations Intercepted | 443 |
| Number of calls marked NP on logs | 40 |

\* \* \* \* \* \*

On all three taps, while each of the orders contained the statutory directions with respect to minimization, no specific instructions appear to have been given to the monitoring agents as to how minimization was to be effected. There is no evidence that any periodic reports were made to the courts issuing the wiretap orders or any supervision of the monitoring process by the court. Nor is there any evidence that the issuing court, during the course of the wiretaps, ever gave consideration as to how minimization could be effected in the light of what developed during the course of the interceptions.

With one exception all calls were intercepted and none were ever shut off. The calls intercepted included a substantial number of overheard conversations deemed not pertinent at the time by the monitoring officers—some 40% of the Holder conversations, 20% of the Logan conversations and 10% of the McBride conversations.

---

9. An extension order was signed December 7, 1971.

None of the 42 calls received in evidence at the trial is in this category. These calls were all highly pertinent to the investigation and of obvious evidentiary value from the beginning. Interception of these calls was fully authorized by the respective wiretap orders and fell squarely within their terms.

Among the calls, almost all of which were listed as DNP or NP, were some 26 calls over the Holder telephone to a doctor, hospital or dentist, some 6 of which were summarized in the logs, and frequent calls by Errol Holder placing or discussing policy bets; some 140 calls on the Logan telephone in which one of the participants was her 13-year-old daughter Tracy, about 50 of which were conversations between Tracy and her school mate, Tina, and some 20 calls on the McBride telephone to airconditioning, furniture and credit companies, a hospital and her small child. No calls were turned off by the monitoring officers as privileged. A number of calls which might have fallen into the privileged category were monitored, though it does not appear that privileged matter actually came to light in any of them.

The Government takes the position that because of the nature and extent of the widespread narcotics conspiracy under investigation, it was, for all practical purposes, impossible to minimize the interceptions in this case since there was no discernable pattern of non-pertinent calls. Otherwise, the whole purpose of the investigation would be defeated.

At the post-trial hearing, the Government presented the testimony of Supervising Narcotics Agent Harris, who had analyzed the calls intercepted in terms of their investigative or evidentiary value from the standpoint of the case as a whole rather than on the contemporary judgment of the monitoring police officers. Harris testified that, on the basis of a fair sampling, approximately one-half of the calls lasted less than one minute. Quite plainly, such calls were not required to be shut off since there was not enough time to determine who the parties were or what was the subject of the conversation.

According to Harris, about one-half of the calls marked on the logs as DNP or NP turned out to be of investigative or evidentiary value, even though in the contemporary judgment of the monitoring police officers they were not pertinent. Though Harris seems to have used an overly expansive test of investigative value,[10] it is plain that certain calls so marked were pertinent. For example, one call pertained to picking up girls to operate the narcotics cutting mill; another concerned a girl seeking employment as a mill girl. Several of the calls in which the Logan daughter, Tracy, participated concerned messages from or for defendant Abraham which were pertinent to the investigation.

The Government points to the difficulties faced by the monitoring officers in determining which calls were pertinent and which were not. Among these considerations are the following: the conversations were conducted in the argot of the underworld, in guarded language and frequently in code; voices and names were difficult to identify; there were a large number of participants in varying roles in the criminal enterprise; the information as to the conspiracy was constantly expanding, with new participants and new places where criminal activities were carried on frequently coming to light; it was necessary to make frequent checks with other phases of the investigation so that the surveillance activities simultaneously conducted could be effectively carried out; the whereabouts of the principals at any given time were important in themselves in terms of the context of the enterprise as a whole; lengthy calls, largely concerned with non-pertinent matters, particularly

---

10. For example, any call made by a defendant at home was deemed by Harris to be of evidentiary value since it told the monitoring officers where that defendant was.

those of co-conspirators, were likely to include discussions of highly pertinent subjects; on the basis of hindsight, at least 90% of the calls furnished valuable and pertinent information; all of this contributed to the overall difficulties of determination by the monitoring officers of what calls were not interceptable.

There is little doubt in the light of these facts and the nature and extent of the criminal narcotics enterprise being carried on that the monitoring officers were faced with very great difficulties. Nevertheless, it cannot be said in this case that the minimization requirements were satisfactorily complied with.

 The test of whether or not the minimization requirements are complied with is not retrospective but contemporaneous. Though retrospective analysis of the pertinency of the calls intercepted may have some value, the monitoring officers must determine contemporaneously when to turn off the intercepting machine and stop listening so as to avoid conversations not authorized by the order. There were a substantial number of calls here which should have been shut off and not listened to and this was not done. Instead, such calls were overheard and often summarized on the log. Moreover, whatever the situation was at the outset of the interceptions, there was apparently no evaluation of the monitoring as it proceeded to determine which calls should be intercepted and which should not. The interception continued to the end full blast, without the imposition of any restraints or instructions on that subject.

 It must be recognized that in authorizing interception for the purpose of obtaining information as to such a widespread narcotics conspiracy as this, some non-pertinent calls will necessarily be overheard. But the absence of any precautions to insure minimization here, the number of such calls intercepted and the lack of supervisory techniques impel

the conclusion that the minimization requirements were not satisfactorily observed. I so find.

The basic question is whether or not the finding that the minimization requirements were not satisfactorily complied with entitles defendants to the relief which is the object of their present motions. That relief is directed at the suppression of the 42 intercepted telephone conversations admitted in evidence at the trial. The consequence of granting such relief would necessarily be that this evidence would be stricken from the record and the verdicts of conviction set aside.

As I have already pointed out, there can be no question that the interceptions of the 42 calls in evidence were fully authorized by the respective wiretap orders. The conversations intercepted were plainly pertinent to the investigation and of evidentiary value. On the instant motions the validity of the orders of authorization have already been decided by me and is not in question here.

 In my view, there is no basis for the suppression of the 42 calls validly and properly intercepted because minimization requirements as to other calls were not satisfactorily complied with. Such suppression is neither required by the provisions of 18 U.S.C. Chapter 119, under which the interceptions were made, nor by any other principle of law, and would be contrary to established law and public policy.

In Chapter 119 [11] Congress sought to strike a balance between the legitimate requirements of effective law enforcement and the constitutional right to privacy, guided by the then recent decisions of Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) and Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). It has since been held, a number of times, that Congress succeeded in so doing and

11. As has been pointed out, supra p. 738, the New York statute under which these communications were intercepted is for

all practical purposes a counterpart of Chapter 119 and complies with its requirements.

that the statute is constitutional. *See, e.g.,* United States v. Tortorello, 480 F.2d 764 (2d Cir., 1973); United States v. Cox, 462 F.2d 1293 (8th Cir. 1972); Cox v. United States, 449 F.2d 679 (10th Cir. 1971), cert. denied, 406 U.S. 934, 92 S. Ct. 1783, 32 L.Ed.2d 136 (1972).

The scheme of the statute prohibits the interception of wire or oral communications except as specifically provided for in the Chapter. § 2511. Disclosure of information in violation of the Chapter is forbidden, § 2515, and the circumstances under which disclosure is permitted of information secured under authority of the Chapter is strictly regulated. § 2517. Criminal penalties and civil remedies for damages are provided for violations. §§ 2511, 2512, 2520. *See* United States v. Cox, *supra,* 462 F.2d at 1301–1302; United States v. LaGorga, 336 F.Supp. 190, 196–197 (W.D.Pa. 1971).

The statute sets up numerous safeguards designed to protect against invasion of the right of privacy. An order authorizing interception can only be obtained from a judge of a court of competent jurisdiction by specified law enforcement officers. § 2516. It must be supported by a detailed showing under oath that there is probable cause that one of the serious crimes specified in the statute (§ 2516) is being, has been, or is about to be, committed by a named individual or individuals; that an identified telephone is being used for these criminal purposes and that no other investigative technique is likely to succeed. § 2518(1).

There must be findings by the judge that there is probable cause to believe all this before such an order can be issued. § 2518(3). Time limitations are placed on the interception. § 2518(5). The order must contain minimization directions. *Id.* It may be noted that the minimization provision of the statute does not contemplate that no unauthorized calls will be intercepted. Indeed, the very use of the word "minimize" indicates that Congress recognized as a practical matter that some unauthorized calls might necessarily be intercepted but that these should be reduced, as far as possible, to a minimum.

Periodic reports can be required by the issuing judge. § 2518(6). Conversations should be recorded on tapes and the tapes must be sealed, subject only to proper usage under the supervision of the court. § 2518(8)(a). Within 90 days after termination of interception, notice must be given to the persons named in the order or application and to other persons overheard if the judge so directs. § 2518(d).

Any aggrieved person may move to suppress the contents of any intercepted wire or oral communication or evidence derived therefrom. § 2518(10)(a).

The report of the Senate Committee on the proposed statute states, "There is . . . no intention . . . generally to press the scope of the suppression role beyond present search and seizure law," S.Rep. No. 1097, 2 U.S.Code Cong. & Admin.News, pp. 2112, 2185 (1968).

■ In the ordinary case the seizure of some items beyond those specified in a search warrant does not result in the suppression of those items which were validly seized. *See, e.g.,* Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1917) (as to the liquors); United States v. Dzialak, 441 F.2d 212 (2d Cir.)(as to all items seized except the watches), cert. denied, 404 U.S. 883, 92 S.Ct. 218, 30 L.Ed.2d 165 (1971); Brooks v. United States, 416 F.2d 1044, 1049–1050 (5th Cir. 1969), reh. denied, 424 F.2d 554 (5th Cir. 1970), cert. denied, Nipp v. United States, 400 U.S. 840, 91 S.Ct. 81, 27 L.Ed.2d 75 (1970); United States ex rel. Nickens v. La-Vallee, 391 F.2d 123 (2d Cir. 1968) (as to items seized from Nickens' living quarters other than the newspaper clippings); United States v. King, 335 F. Supp. 523, 544–545 (S.D.Cal.1971), rev'd on other grounds, 478 F.2d 494 (9th Cir. 1973); United States v. Leta, 332 F.Supp. 1357, 1360 (M.D.Pa.1971); United States v. Castle, 213 F.Supp. 52,

56, 60 (D.D.C.1962), aff'd 120 U.S.App. D.C. 398, 347 F.2d 492 (1963), cert. denied, 381 U.S. 929, 953, 85 S.Ct. 1568, 14 L.Ed.2d 687 (1965). It was plainly the intent of Congress that the same rule should be applied in the case of wire communications intercepted under Chapter 119 and that, in my view, is what the statute provides.

United States v. Cox, 462 F.2d 1293, 1301 (8th Cir. 1972), so holds:

> Clearly Congress did not intend that evidence directly within the ambit of a lawful order should be suppressed because the officers, while awaiting the incriminating evidence, also gathered extraneous conversations. The nonincriminating evidence could be suppressed pursuant to 18 U.S.C. § 2518(10)(a), but the conversations the warrant contemplated overhearing would be admitted.

United States v. King, *supra,* to the same effect as *Cox,* is a convincing exposition of the reasons why suppression of all calls should not be granted because of failure of minimization. In *King,* the agents had been instructed that "every conversation was to be recorded, except those between an attorney and client concerning a pending criminal case. As to those conversations which were obviously irrelevant to the smuggling conspiracy, the agents were simply told there was no need to monitor them." 335 F.Supp. at 540–541. *See also* United States v. Mainello, 345 F.Supp. 863 (E.D.N.Y.1972); United States v. La-Gorga, *supra,* 336 F.Supp. at 195–197.

This is not a case where suppression could be called for because the communications admitted to the trial were tainted by conversations intercepted in violation of minimization requirements. Here there was no claim that the 42 conversations admitted in the trial and lawfully intercepted were tainted. These conversations stood on their own feet as relevant evidence of participation in and commission of the crimes charged.

Nor is this a case where a single conversation with one individual or a single transaction is the object of the wiretap. Here the investigation was concerned with a complicated and widespread criminal enterprise involving numerous transactions and many persons. As was pointed out in La Gorga, *supra,* at 196:

> [I]t is often impossible to determine that a particular telephone conversation would be irrelevant and harmless until it has been terminated. It is certainly not unusual for two individuals using the telephone to discuss social matters or items of general interest before getting to the precise point which is to be covered in the call. Similarly, when a call is made to a residence, the telephone is often answered by a young child who will turn it over to one of the adult members of the household at some point in the conversation. It is also rather common that a telephone conversation initially between two children will later develop into a discussion between adults.
>
> \* \* \* \* \* \*

It is all well and good to say, after the fact, that certain conversations were irrelevant and should have been terminated. However, monitoring agents are not gifted with prescience and cannot be expected to know in advance what direction the conversation will take. It is also true that, during the early part of the surveillance, it was necessary for the agents to familiarize themselves with the voices of those who were working with the defendants.

The only case holding that all calls, whether intercepted under the terms of the authorization order or not, should be suppressed because minimization requirements were not complied with is United States v. Scott, 331 F.Supp. 233 (D.D.C.1971) (appeal by Government pending).[12] It was there said that absent such a holding "the protections to

---

12. Some cases holding that minimization requirements of § 2518(5) were satisfied,

and thus did not have to decide the remedy question, have cited *Scott* with appar-

the right of privacy outlined in *Berger* and *Katz* would be illusory." 331 F. Supp. at 248.

I do not find *Scott* persuasive and do not follow it. In my view, what *Scott* seeks to accomplish has already been accomplished by the statute itself with the safeguards Congress has provided. I see no reason why a different rule should be applied in the interceptions of telephone conversations under court order than is applied to items seized under search warrants issued by the court. To do so would be not only unnecessary for the protection of constitutional rights but contrary to the public interest in legitimate and effective law enforcement.

I hold, therefore, that the defendants are not entitled to suppress all conversations intercepted pursuant to the wiretap orders in this case, including the 21 intercepted conversations admitted in evidence.

The defendants' motions to suppress are denied in all respects, both on the ground that defendants waived their rights to make such motions and on the merits.

It is so ordered.

ent approval. United States v. Tortorello, 480 F.2d 764, 783, 784 (2d Cir., 1973) (which does not refer to Eighth Circuit opinion in United States v. Cox, *supra*); United States v. Lanza, 349 F.Supp. 929, 932 (M.D.Fla.1972); United States v. Fo-

carile, 340 F.Supp. 1033, 1044–1050 (D. Md.1972), aff'd sub nom. United States v. Giordano, 469 F.2d 522 (4th Cir. 1972). *See also* United States v. Leta, 332 F. Supp. 1357, 1360 n. 4 (M.D.Pa.1971) (dictum).