UNITED STATES of America,
Appellee,

v.

Albert Sander BRICK, Appellant.

UNITED STATES of America,
Appellee,

v.

Harry John McCUTCHEON,
Appellant.

UNITED STATES of America,
Appellee,

v.

George WEIDLICH, Appellant.

UNITED STATES of America,
Appellee,

v.

Joseph SAMELSON, Appellant.

UNITED STATES of America,
Appellee,

v.

Ronald Garold WEINBERG,
Appellant.

Nos. 73–1162 to 73–1164, 73–1186
and 73–1192.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 14, 1973.

Decided Aug. 15, 1974.

Bright, Circuit Judge, concurred and filed opinion.

Murry L. Randall, St. Louis, Mo., for McCutcheon.

Robert J. Roster and Arthur S. Margulis, St. Louis, Mo., for Weinberg.

Irwin L. Ruzicka, St. Louis, Mo., for Samuelson.

Daniel J. O'Toole, Jr., St. Louis, Mo., for Weidlich.

Richard L. Daly and Robert A. Hampe, St. Louis, Mo., for Brick.

Donald J. Stohr, St. Louis, Mo., Thomas M. Vockrodt, Sp. Atty., Strike Force, St. Louis, Mo., Robert L. Keuch, Peter M. Shannon and Robert H. Plaxico, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before GIBSON and BRIGHT, Circuit Judges, and TALBOT SMITH,* Senior District Judge.

TALBOT SMITH, Senior District Judge.

This case involves an alleged violation of 18 U.S.C. § 1955 (conducting an illegal gambling business)[1] and conspiracy with

---

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

1. 18 U.S.C. § 1955 provides in pertinent part:

(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.

(b) As used in this section—

(1) "illegal gambling business" means a gambling business which—

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

(2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

(3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and

respect thereto. The case, presented upon a stipulation of facts, resulted in a finding of guilt. We affirm.

Viewing the facts and opinions stipulated in the light most favorable to the Government, and in more detail *infra* as required, it appears that the defendants, together with Aaron Singer and Harry Safren were engaged in the business of accepting bets on various horse races and athletic contests. Singer was the center of the enterprise. He telephoned the "lines"[2] on particular sporting events to Safren and the defendants who, in turn, disseminated the lines to their various betting customers. Safren, and defendants Brick, Samuelson, and Weinberg then relayed to Singer the bets from their customers. It was agreed that each would receive 50 per cent of any profits generated by the bets he relayed, and, in addition, each was guaranteed the payment of any losses sustained in receiving the wagers. Weinberg, additionally, was paid an extra $50 per week by Singer whether or not any profits were made from his relayed bets. Defendants McCutcheon and Weidlich, having received bets from their customers, would "lay off"[3] wagers with Singer. The telephone conversations between Singer and defendants pertained to the discussion of lines, to the arranging of receipts of bets and lay offs, and to their accounts with Singer and with various customers. The conversations frequently involved mention of the activities of various of the defendants.

Much of the evidence relied upon by the Government was obtained from the defendants' telephone conversations with Singer, intercepted pursuant to court order of January 8, 1971. Defendants challenge the order for non-compliance with the requirements of 18 U.S.C. § 2518(1)(a)[4]; specifically, the deficiencies charged are that the application for the order "stated therein that Will Wilson was the authorizing official," such authorization resting upon a letter purportedly from Wilson granting such authority, actually, however, having been signed by Henry Petersen, then Deputy Assistant Attorney General, Criminal Division. The Court's order of interception, however, stated that the Attorney General was the authorizing authority and thus, argue defendants, the application and the order "were in direct conflict" and in violation of § 2518(1)(a) which requires that the application shall contain the identity of the officer so authorizing.

There is no doubt that we are confronted with contradictory facial representations. Unless we are to elevate form over substance, however, our inquiry focuses upon whether or not there has been a subversion of the congressional scheme. The intent of the statute, in view of its manifest intrusion upon the privacy of the individual which results from the approval of a wiretap, was to provide a safeguard in order to prevent abuse. To this end Congress "intentionally restricted the category of federal officials who could give such approval to only the

---

any territory or possession of the United States.

2. A line is utilized to equalize competing teams and to attempt to insure approximately equal distribution of bets. A line, it was stipulated, "is an addition to or subtraction from the anticipated point scoring potential of each of the two participating teams which is designed to equalize the betting propositions and thereby to induce the placement of bets by customers on both teams."

3. Lay off, it was stipulated, "is a bet or wager placed by one bookmaker with another bookmaker which is necessitated by the influx of an imbalance of bets and wagers on

a given sporting event and which has the effect of distributing the said bets and wagers, thus minimizing risk of substantial loss."

4. 18 U.S.C. § 2518(1)(a) provides:
   (1) Each application for an order authorizing or approving the interception of a wire or oral communication shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:
   (a) the identity of the investigative or law enforcement officer making the application, and the officer authorizing the application * * *.

Attorney General himself or any Assistant Attorney General he might specially designate for that purpose."[5]

The record before us discloses that the Attorney General himself (according to the affidavit of his Executive Assistant, Mr. Sol Lindenbaum)[6] approved the request for the interception order, and personally initialed the memorandum dated January 8, 1971 to Will Wilson designating him to authorize Attorney Vockrodt to apply for the interception order.[7] Such a memorandum, in substantially identical terms, was construed in United States v. Chavez, *supra* note 5, 94 S.Ct. at 1852, as "intended to reflect notice of approval by the Attorney General, though on its face it suggested that the decision whether to authorize the particular wire-

tap application would be made by Assistant Attorney General Wilson." It is clear also that the signing of Wilson's name by his Deputy Assistant, here Henry Petersen, was regarded as simply a "ministerial act" in view of Wilson's authorization to his Deputies to execute letters of authorization in every case in which he had been specially designated to authorize the applicant to make the application.[8]

Upon the record before us, then, we have no more than a cosmetic blemish. The application recited that Will Wilson was the authorizing official, whereas in truth (and as recited in the District Court's order) it was the Attorney General. Such misidentification, regrettable though it is, does not render intercep-

---

5. United States v. Chavez, 416 U.S. 562, 94 S.Ct. 1849, 1854, 40 L.Ed.2d 380 (1974).

6. The Lindenbaum affidavit reads in part as follows:
District of Columbia:
Sol Lindenbaum being duly sworn, deposes and says:
I am Executive Assistant to the Attorney General of the United States.
On January 8, 1971, the Attorney General approved a request for authority to apply for an interception order with respect to certain telephones in University City and St. Louis, Missouri, allegedly used by Steve Lekometros and others. Attached is a copy of his personally initialed memorandum of that date to Will Wilson, the Assistant Attorney General in charge of the Criminal Division, specially designating him to authorize Thomas M. Vockrodt to apply for an interception order.
\* \* \* \* \*

7. Defendants suggest from the same dating of various documents before us that either the Government has exercised "an unbelievable degree of governmental efficiency" or the documents were issued "without the conscious reflection of a responsible officer." The Government, in reply, urges its "technological efficiency" and refers us to United States v. Pisacano, 459 F.2d 259, 263 (2nd Cir. 1972), vacated, 417 U.S. 903, 94 S.Ct. 2597, 41 L.Ed.2d 208 (1974), wherein the routine procedures of the Department of Justice in a matter of this kind are discussed. We do not regard the defendants' suggestion as impeaching the conclusions here reached.

8. The affidavit filed with the District Court states as follows:

District of Columbia:
Henry E. Petersen, being duly sworn, deposes and says:
I am Acting Assistant Attorney General in charge of the Criminal Division, United States Department of Justice.
I signed the name of Will Wilson, Assistant Attorney General, Criminal Division, to the following communications notifying Thomas M. Vockrodt that he was authorized to make court applications under Title 18, United States Code, Section 2518, for interception orders:
a. An undated letter transmitted on January 8, 1971, relating to certain telephones in University City and St. Louis, Missouri, allegedly utilized by Steve Lekometros and others;
b. A letter dated April 20, 1971, relating to certain telephones in St. Louis and St. Louis County, Missouri, allegedly used by Aaron Singer and others; and
c. A letter dated May 13, 1971, relating to certain telephones in St. Louis and St. Louis County, Missouri, allegedly used by Eugene Hanon and others.
At those times when I signed the above letters, I was a Deputy Assistant Attorney General in the Criminal Division and acted in accordance with the authorization of Will Wilson and the standard procedures of the Criminal Division. The signing of Will Wilson's name was in conformity with the standard procedure of dispatching such a letter in every case in which Will Wilson had been specially designated on an *ad hoc* basis to authorize the applicant to make the application.
/s/ HENRY E. PETERSEN
Acting Assistant Attorney General
Criminal Division

tions conducted under the order unlawful in any respect. As the Supreme Court held in *Chavez, supra* note 5, 94 S.Ct. at 1853, "We agree with those other courts of appeal [citing, among others, United States v. Cox, 462 F.2d 1293, 1300 (8th Cir. 1972)] that misidentifying the Assistant Attorney General as the official authorizing the wiretap application to be made does not require suppression of wiretap evidence when the Attorney General himself has actually given the approval; * * *." There were no grounds upon the facts presented justifying the granting of a motion to suppress the wiretap evidence.

■■■■ With respect to the pen register[9] employed, the defendants argue that its installation was unauthorized by Title III.[10] Actually, as the legislative history of the act shows,[11] the use of pen registers was not prohibited by Title III. Nor is such use controlled by 47 U.S.C. § 605, as amended.[12] In this situation it has been held that a pen register order based upon a showing of probable

cause, even if considered to be a "search" is not constitutionally offensive. Mr. Justice Powell's statement in concurrence and dissent in United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820, 1845, 40 L.Ed.2d 341 (1974) to the effect that "[b]ecause a ʓ⁻⁻ register device is not subject to the provisions of Title III, the permissibility of its use by law enforcement authorities depends entirely on compliance with the constitutional requirements of the Fourth Amendment" [footnote omitted], had earlier expression in United States v. Focarile, 340 F.Supp. 1033, 1038–1040 (D.Md.1972) (*Giordano, supra,* in the District Court); United States v. Escandar, 319 F.Supp. 295, 303–304 (S.D. Fla.1970), remanded on other grounds sub nom. United States v. Robinson, 472 F.2d 973 (5th Cir. 1973) (en banc).

The affidavit submitted to the Court in the application of the Government for an order authorizing the interception of wire communications bears upon two issues before us, namely, probable cause

9. A pen register is a mechanical device which records on tape the numbers dialed from a given line. *See* United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820, 1842 n. 1, 40 L.Ed.2d 341 (1974) (Powell, J., dissenting in part).

10. Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520.

11. S.Rep.No.1097, 90th Cong., 2nd Sess. 90 (1968) :
   [18 U.S.C. § 2510(4)] defines "intercept" to include the aural acquisition of the contents of any wire or oral communication by an electronic, mechanical, or other device. Other forms of surveillance are not within the proposed legislation. * * * The proposed legislation is not designed to prevent the tracing of phone calls. The use of a "pen register," for example, would be permissible.

12. As originally enacted, 47 U.S.C. § 605 provided in part:
   No person receiving or assisting in receiving, or transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmis-

sion or reception * * * in response to a subpena [sic] issued by a court of competent jurisdiction, or on demand of other lawful authority; and no person not being authorized by the sender shall intercept *any communication* and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person * * *. [Emphasis added].
Act of June 19, 1934, ch. 652, § 605, 48 Stat. 1103.
   As amended in 1968, the statute now reads in part:
   Except as authorized by chapter 119, Title 18, no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect or meaning thereof, except through authorized channels of transmission or reception, * * * (5) in response to a subpena [sic] issued by a court of competent jurisdiction, or (6) on demand of other lawful authority. No *person not being authorized by the sender* shall intercept *any radio communication* and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. [Emphasis added].

under the Fourth Amendment for the wire interception and the use of the pen register as well as the "need"[13] for the order prayed.

■ The affidavit presented, that of Robert J. Wilkinson, Special Agent of the F.B.I., set forth in detail his personal observations concerning the investigations conducted, as well as those of two unnamed informants, one of whom had provided reliable information for several years to Special Agents "on a continuous basis concerning gambling matters." The affidavit described in detail the operations of the gamblers, and named certain of the persons involved, together with their places of meetings, movements and conversations. In addition it was stated that the informants, noted above, would not testify, nor, as evidenced by past experience, would the gambler's customers; that gambling raids had in the past proved ineffective, as had the telephone toll records.

The above representations in the affidavit, in conjunction with others more detailed contained therein, furnished ample probable cause for the order entered and were sufficient to demonstrate on a factual basis, as distinguished from a mere conclusion, that "other procedures reasonably appear unlikely to succeed."[14] The statute does not require more.

■ The Act before us, 18 U.S.C. § 1955(b)(1)(ii), violation of which is charged, defines an "illegal gambling business" as one "involv[ing] five or more persons who conduct, finance, manage, supervise, direct or own all or part of such business." It is the position of the defendants in this respect that the proofs must establish that "the alleged violator knew that the activity engaged in was composed of five or more." There is no merit to such contention. The Congress, in enacting the legislation under consideration, sought to differentiate between "illicit gambling business[es] of major proportions" and "those whose operations are relatively small."[15] The line was drawn as defined in § 1955 of the Act, those operations being deemed to be of a magnitude sufficient to furnish the required nexus for the application of the commerce clause.[16] The accused's knowledge, or lack of knowledge, of the congressional determination of the required nexus does not comprise an essential element of the crime charged. United States v. Smaldone, 485 F.2d 1333, 1348 (10th Cir. 1973) cert. denied, 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286 (1974); United States v. Ianelli, 477 F.2d 999, 1002 (3rd Cir. 1973), cert. granted, 417 U.S. 907, 94 S.Ct. 2602, 41 L.Ed.2d 211 (1974).

■ We reject defendants' further contention, in effect, that they conducted five separate bookmaking businesses each involving less than five persons. The record shows that each defendant,

13. 18 U.S.C. § 2518(1)(c) provides:
    (1) Each application for an order authorizing or approving the interception of a wire or oral communication shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:
    *    *    *    *    *
    (c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous *  *  *.

14. United States v. Pacheco, 489 F.2d 554, 559 (5th Cir. 1974); United States v. Bobo, 477 F.2d 974, 982 (4th Cir. 1973); see United States v. Kahn, 415 U.S. 143, 94 S. Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974). The provision of the statute in this respect is simply "that the showing be tested in a practical and commonsense fashion." S. Rep.No.1097, 90th Cong., 2nd Sess. 101 (1968).

15. 116 Cong.Rec. 603 (1970) (remarks of Senator Allott).

16. The point is discussed in United States v. Sacco, 491 F.2d 995 (9th Cir. 1974) (en banc); concurring opinion of Judge Hufstedler at 1004; dissenting opinion of Judge Ely at 1004.

through his transactions with Singer, became involved in a network of gambling activity of substantial proportions. Although defendants argue that they are independent businessmen, it is evident that the success of their individual operations was dependent upon the success of its various related components, *e.g.*, on their ability to pool their bets with Singer (either through lay-offs or profit sharing agreements) and to share line information through him. The degree of interdependence and interrelation thus shown negates the concept of independence urged upon us. United States v. Sacco, 491 F.2d 995, 1003 (9th Cir. 1974) (en banc). As well put in United States v. Hunter, 478 F.2d 1019, 1022 (7th Cir. 1972) cert. denied, 414 U.S. 857, 94 S.Ct. 162, 38 L.Ed.2d 107 (1973) : "we are satisfied that the three entrepreneurs had a sufficient common interest in the development of sales, the maintenance of security, the efficient performance of services, and the solvency of all three ventures, to make it proper to regard them as a single criminal enterprise for the purposes of the statute here involved." [17]

Defendants Weinberg, Brick and Weidlich also urge, relying on Woosley v. United States, 478 F.2d 139 (8th Cir. 1973) (en banc),[18] that the sentences imposed on them for a variety of reasons (relative sizes of fines imposed,[19] health considerations, since a condition of probation was gainful employment, as well as others) all "constitute an abuse of the court's discretion." [20]

It was Woosley holding that "we possess the power to review the severity of a criminal sentence within narrow limits where the court has manifestly or grossly abused its discretion," 478 F.2d at 147. It was pointed out in the *Woosley* opinion that the trial court had followed a given "policy" in the type of case there involved (selective service) and thus there had been no exercise of discretion in any realistic sense, 478 F.2d at 143–144. The present case offers no parallel, nor does it fall within any other ground fairly comprehended within the term "abuse" of discretion. The court obviously apportioned the sentences with care, employing varying degrees of severity. The fact that such apportionment does not coincide with that urged

17. Relevant hereto is an issue frequently litigated under § 1955(b)(1)(ii), whether a minor functionary in a gambling operation should be counted as one who "conducts" part of the business. The courts have held that "all levels of personnel involved in operating an illegal gambling business and not merely the management level are to be included in determining whether five or more persons conduct such business * * *." United States v. Meese, 479 F.2d 41, 43 (8th Cir. 1973) ; United States v. Manson, 494 F.2d 804 (7th Cir. 1974) ; United States v. Palmer, 465 F.2d 697 (6th Cir.), cert. denied, 409 U.S. 874, 93 S.Ct. 119, 34 L.Ed.2d 126 (1972) ; United States v. Becker, 461 F.2d 230 (2nd Cir. 1972), vacated on other grounds, 417 U.S. 903, 94 S.Ct. 2597, 41 L.Ed.2d 208 (1974) ; United States v. Harris, 460 F.2d 1041 (5th Cir.), cert. denied, 409 U.S. 877, 93 S.Ct. 128, 34 L.Ed.2d 130 (1972). In this connection it has been held that a bookmaker who makes "lay off" bets conducts the business of the gambling operation with which he places his bets, United States v. McHale, 495 F.2d 15, 18 (7th Cir. 1974) ; and that one who receives lay off bets from and gives line information to other bookmakers may be counted as conducting part of their business, United States v. Ceraso, 467 F.2d 653, 656 (3rd Cir. 1972).

18. See also United States v. Dace, 502 F.2d 897 (8th Cir. 1974).

19. Defendant Weinberg's fine is attacked as excessive in comparison with the fines of the others. The government responds, with figures purporting to show "the greater magnitude of Weinberg's share of the business."

20. Defendants Brick, Samelson, and Weidlich were each fined $1,000 and sentenced to three years, Brick and Weidlich to serve six months of their sentences, Samelson one year, with the balance probation in each case. Defendant McCutcheon was fined $2,500 and sentenced to three years, one year to be served, the balance on probation. Defendant Weinberg was sentenced to three years, one year to be served, the balance on probation, and fined $10,000. Second Count sentences were identical with those on the first count, with the exception of the fines imposed. Probation for all defendants involved, among other conditions, a requirement of "gainful employment."

**226**

by the defendants will not be taken as an abuse of discretion. We find no abuse.

Affirmed.

BRIGHT, Circuit Judge (concurring):

I concur in Judge Smith's excellent opinion but add an additional comment relating to the legal status of the "approval" of this wiretap by the Attorney General.

This record discloses that Attorney General Mitchell placed his initials on a memorandum directed to Assistant Attorney General Will Wilson designating him to authorize the prosecuting attorney to apply for an order authorizing the wiretap. Mitchell has not filed any affidavit in this action explaining the significance of these initials but his executive assistant, Sol Lindenbaum, filed an *ex post facto* affidavit stating that "the Attorney General approved" the request for authority for the wiretap with his "personally initialed memorandum." Further, an affidavit of Assistant Attorney General Henry Petersen states that he signed Will Wilson's name to the wiretap authorization letters in accordance with "standard procedures of the Criminal Division."

I retain great doubt as to who, if anyone, actually considered the merits of the wiretap authorization. The Attorney General initialed a memorandum authorizing Will Wilson to act on the application. Will Wilson did not do so but Assistant Attorney General Henry Petersen signed Wilson's initials signifying an approval of the request, a procedure not sanctioned by the wiretap statute. United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). Were I free to exercise my own judgment, I would remand this case to the district court to require an explanation of this "standard procedure" by the Department. I think it highly questionable whether the *ex post facto* conclusionary statement of Executive Assistant Sol Lindenbaum that Mitchell had "approved" the wiretap is sufficient to show

Mitchell's actual approval when that same affidavit recites that Mitchell had assigned this task of approval to Will Wilson. Yet, notwithstanding this reservation, I vote for affirmance because I believe the question has been effectively foreclosed by the Supreme Court's decision in the *Chavez* opinion.

In *Chavez*, the majority stated:

While the Attorney General had apparently refrained from designating any Assistant Attorney General to exercise the authorization power under § 2516(1), form memoranda were routinely sent from his office, over his initials, to Assistant Attorney General Wilson, stating that "with regard to your recommendation that authorization be given" to make application for a court order permitting wire interception, "you are hereby specially designated" to exercise the power conferred on the Attorney General by § 2516 "for the purpose of authorizing" the applicant attorney to apply for a wiretap order. [94 S.Ct. at 1852.]

The Court further commented:

Evidently this form was intended to reflect notice of approval by the Attorney General, though on its face it suggested that the decision whether to authorize the particular wiretap application would be made by Assistant Attorney General Wilson. In fact, as revealed by the affidavits of Wilson's then Deputy Assistants filed in opposition to respondents' suppression motions, "Wilson did not examine the files or expressly authorize the applications" for either the February 18 or February 25 interception orders, and they signed his name "in accordance with [his] authorization . . . and the standard procedures of the Criminal Division" to the respective letters of authorization to the applicant attorney, which were made exhibits to the applications. The signing of Wilson's name was regarded as a "ministerial act" because of Wilson's authorization to his Deputies "to sign his name to and dispatch

such a letter of authorization in every instance in which the request had been favorably acted upon in the Office of the Attorney General." [94 S.Ct. at 1852.]

I read *Chavez* as construing the existence of the Attorney General's initials on form memoranda to Will Wilson and the subsequent affidavits of Sol Lindenbaum or Mitchell himself stating that those initials signified approval for the authorization to be sufficient to establish the wiretap authority, without more. The existence of these initials is not a matter of dispute and the conclusion of approval follows from the affidavit. The procedure followed here was substantially identical to that in *Chavez*. I take it that the Supreme Court has placed its imprimatur of legal validity to that standard procedure. Thus, under *Chavez*, I believe we must affirm. If the question of actual authorization by the Attorney General were still open, I would remand this case to the district court for an evidentiary hearing by way of further affidavits on whether the Attorney General's initials signified an actual approval of the wiretap.

Affirmed.

Craven, Circuit Judge, filed a dissenting opinion.